**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 16-CR-232 (KBJ)** |
| **EDGAR MADDISON WELCH,** | |
| *Defendant.* | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the following Sentencing Memorandum.

## INTRODUCTION

On December 4, 2016, the defendant left his home in North Carolina carrying an AR-15 assault rifle, a pistol and a shotgun. He then drove across state lines to commit crimes that endangered the lives of everyone inside of Comet Ping Pong ("Comet"), a popular neighborhood restaurant in Washington, D.C. He was expressly willing to sacrifice those lives – the lives of innocent people – so that he could pursue vigilante acts of violence against non-existent criminals. The fact that no one was shot was entirely the product of good luck – the fortuitous facts that nobody interfered with the defendant's progress and that nobody was behind the door which he ultimately shot through.

The defendant committed serious crimes that terrorized a community and traumatized Comet employees and customers alike. There are victims who require crisis counseling, employees who feel unsafe in their jobs, and children whose memories are imprinted with the danger of that day. The government submits that the facts of this case require a significant sentence, not only to punish the defendant for his actions, but also to keep the community safe

from the defendant and to deter other would-be vigilantes from attempting similar crimes against innocent subjects of the next internet-inspired conspiracy theory.  For all of these reasons, and as set forth further below, the government respectfully requests that the Court sentence the defendant to a total of 54 months (or 4½ years) in prison, to be followed by 3 years of supervised release, and that the Court also order the defendant to pay restitution for property damage at Comet.

## FACTUAL BACKGROUND

### The Statement of Offense

On March 24, 2017, the defendant accepted responsibility and pled guilty to one count of Interstate Transportation of a Firearm, in violation of 18 U.S.C. § 924(b), and one count of Assault with a Dangerous Weapon, in violation of D.C. Code § 22-402.  The defendant agreed to a Statement of Offense, which, as set forth below, described just some of the evidence that established his guilt.

On December 4, 2016, at about 8:50 a.m., the defendant left his home in Salisbury, North Carolina, and drove to Washington, D.C.  He then drove directly to Comet, transporting an AR-15 assault rifle loaded with 29 rounds of ammunition, a fully-loaded 6-shot revolver, and a loaded twelve-gauge shotgun with additional ammunition.

The defendant was motivated, at least in part, by unfounded rumors about a child sex trafficking ring that was being perpetrated by nationally-known political figures at Comet.  The defendant had begun to focus on those rumors (known collectively as "Pizzagate" rumors) on December 1, 2016, essentially by watching YouTube videos and reviewing related internet content.  Based on those unfounded rumors, the defendant then took it upon himself to carry out what he believed would be a violent confrontation at the restaurant.  The defendant unsuccessfully

tried to recruit friends to carry out his plan of "sacraficing [sic] the lives of a few for the lives of many[.]"

The defendant's friends declined the invitation, so the defendant traveled to Washington alone.  During the drive, the defendant intended to carry out an armed assault on people inside Comet who were either participating in the (non-existent) sex-trafficking ring or who otherwise interfered with his ability to "investigate" the Pizzagate rumors that he had seen on YouTube.

When the defendant arrived in Washington, D.C., he parked in front of Comet and exited his car carrying the loaded .38 revolver in a holster on his hip, and carrying the loaded AR-15 in his hands.  He walked directly into the restaurant, which was occupied by employees and customers (including numerous children).  The defendant carried his AR-15 openly, with one hand on the pistol-style grip, and with the other hand on the hand guard. The AR-15 – an assault rifle which was approximately three feet long – could thus be seen by anyone with an unobstructed view.  The defendant was able to proceed directly to the back of the restaurant without any interference.  The customers and employees who became aware of the defendant feared for their lives, did not interfere with the defendant, and ultimately fled the restaurant.

The defendant was thus able to move freely about the restaurant. He moved furniture around, causing damage to one of the restaurant's ping-pong tables.  While the restaurant was empty, the defendant encountered a locked storage closet.  The defendant did not know whether anyone was behind the closet door.  He attempted to force it open with a butter knife. When that failed, he aimed his AR-15 at the lock on the wooden door and fired multiple times. The resulting gunfire struck and passed through the closet door, damaging a computer and some drywall inside. Fortunately, the closet was unoccupied, and the bullets only caused property damage.

At about the time that the defendant was shooting inside Comet, CW-1, an employee of the restaurant, was retrieving pizza dough from a neighboring business.  While he was carrying the dough back to Comet, CW-1 heard loud sounds, consistent with gunshots.  However, at the time CW-1 did not know what was happening inside the restaurant, and did not know that there was a gunman inside.  CW-1 thus entered the restaurant through a side door that was just a few feet from the defendant's position.  When he opened the door, CW-1 saw the defendant facing the closet at an angle, with the barrel of the AR-15 leveled and pointed in the direction of the closet (at the same angle).  CW-1 saw that the defendant saw him (CW-1), and then saw the defendant then turn towards him with the leveled AR-15, such that the AR-15 was pointed directly at CW-1.  CW-1 immediately feared that he would be shot to death, so he turned and ran for his life.

**The Offense in Context**

Planning and Premeditation

The Statement of Offense did not include all the available evidence about the defendant's conduct and intent.  Rather, as explicitly noted in the document itself, the Statement of Offense merely contained the limited factual proffer that was necessary to demonstrate that there was a sufficient factual and legal basis for the defendant's guilty plea to Counts One and Two of the Indictment.  The government respectfully requests that, in addition to the facts described in the Statement of Offense and the Presentence Report, the Court also consider the evidence below.

The defendant's fixation on Comet began on December 1, 2016, a few days before he actually travelled to the restaurant.   During the next three days, the defendant watched YouTube videos about Pizzagate, formulated a plan to confront the non-existent perpetrators at Comet, tried to recruit friends to join him, and argued with people who said that his plan was foolish.  Evidence recovered from the defendant's cellphone showed that he spent the afternoon of December 1, 2016,

watching YouTube videos.  <u>See</u> Exhibit A (Cellphone Extraction Report).  He texted his girlfriend, W-8, that he was "looking up on pizza gate" and that it was making him "sick."  <u>Id</u>.  Later that night, the defendant insisted on showing W-8 the same videos, which led to an argument between the two.  <u>See</u> Exhibit B (Transcript).  According to W-8, the defendant was acting "hot headed" about Pizzagate.  <u>Id</u>.  The defendant told W-8 about his belief, or showed the videos that formed the basis of his belief, that people associated with Hillary Clinton were conducting a child sex-trafficking ring at Comet and other nearby restaurants.  <u>Id</u>.  According to W-8, she did not have a clear memory or understanding of the details of the defendant's plans, but it seemed to her that night that the defendant wanted to do "something stupid."  <u>Id</u>.  She argued that he should not go forward, but rather that he should think about the "consequences" of his actions.  <u>Id</u>.

On that same evening, the defendant also texted friends.  <u>See</u> Exhibit A.  He sent a link to a YouTube video entitled "PIZZAGATE: The Bigger Picture" to his friend, W-7.  <u>Id</u>.  He also texted with another friend, W-6, telling W-6 that he wanted to discuss something "important."  <u>Id</u>.  W-7 and W-6 nominally agreed to meet the defendant the next day, to discuss the issue.  <u>Id</u>.

By the next day, December 2, 2016, the defendant was intent on recruiting others to join him, and he attempted to do so.  He began by texting W-6, not only asking to meet, but, "Also, u got any army buddies close by?"  <u>See</u> Exhibit C (Cellphone Extraction Report).  W-6 said he had one, and the defendant asked, "he down for the cause?"  <u>Id</u>.  W-6 replied that it depended on the cause.  <u>Id</u>.  The defendant responded, "Raiding a pedo ring, possibly sacrificing [sic] the lives of a few for the lives of many.  Standing up against a corrupt system that kidnaps, tortures and rapes babies and children in our own backyard… defend the next generation of kids, our kids, from ever having to experience this kind of evil themselves[.]  I'm sorry bro, but I'm tired of turning the

channel and hoping someone does something and being thankful it's not my family.  One day it will be our families.  The world is too afraid to act and I'm too stubborn not to."  <u>Id</u>.

The defendant and W-6 met at W-6's home shortly after those messages.  <u>See</u> Exhibit D (Transcript).   According to W-6, the defendant was "worked up" when he arrived.  <u>Id</u>.  The defendant talked about his argument with W-8 over Pizzagate and explained to W-6 that certain individuals were conducting a child sex-trafficking ring at Comet and two other nearby businesses.  <u>Id</u>.  The defendant explained that he wanted to go to Comet; that he did not want to wait; and that he would need to be armed to do it, because he wanted to confront the perpetrators, and he obviously would need to use force in order to accomplish his goals.  <u>Id</u>.  The defendant described his plans in a manner that "basically" described what the defendant actually ended up doing at Comet.  <u>Id</u>.  The defendant also asked W-6 to join the mission and made clear that he wanted W-7 to join as well.  <u>Id</u>.

According to W-6, W-6 asked the defendant skeptical questions about his ideas and pointed out the flaws and dangers of his plan.  <u>Id</u>.  W-6 told the defendant that using a "camera" would be "better" than using a gun.  <u>Id</u>.  W-6 further emphasized that, even if the Pizzagate rumors were true, one could not do anything about the situation without first conducting "recon."  <u>Id</u>.  W-6 hoped that the defendant would just end up doing nothing.  <u>Id</u>.  W-6 later described warning the defendant not to go to the restaurant with "guns blazing."  <u>See</u> Exhibit E (Cellphone Extraction Report).

Notwithstanding the advice from his friend and girlfriend, the defendant remained committed to his planned confrontation at Comet.  During the early morning hours of December 4, 2016, the defendant drove to W-7's house and helped to move some of W-7's personal belongings from one residence to another (W-7 was moving residences).  <u>See</u> Exhibit F

(Transcript). The defendant talked about Pizzagate. Id. According to W-7, the defendant said that Hillary Clinton and people associated with the "Obama Administration" were involved with a child sex-trafficking ring in a pizza restaurant somewhere in Washington, D.C. Id. According to W-7, the defendant asked W-7 to come to Washington to help investigate Pizzagate. Id. According to W-7, W-7 agreed that they could go on a "road trip" sometime, but that W-7 could not immediately go anywhere. Id. The defendant left W-7 and returned to his own home.

Shortly afterwards, the defendant left for Comet. The defendant's text messages show that he left his sleeping children with W-8 (who was also asleep), and that he initially indicated that he would be back. See Exhibit G (Cellphone Extraction Report). However, he had no intention to return. He was on a mission. At about 9:24 a.m., perhaps less than an hour from the time that the defendant left W-7, he texted W-7, "The Spirit of the Sovereign Lord is upon me, for the Lord has anointed me to bring good news to the poor. He has sent me to comfort the brokenhearted and to proclaim that captives will be released and prisoners will be freed. He has sent me to tell those who mourn that the time of the Lord's favor has come, and with it, the day of God's anger against their enemies. Isaiah 61:1-2[.]" See Exhibit H (Cellphone Extraction Report).

While the defendant was driving to D.C., around 11:00 a.m., he used his cellphone to record a message to his family. See Exhibit I (Video Message). He told them that he loved them; that he hoped he had "showed it"; and that he hoped he would be able to "tell [them] again." Id. He said that he could not let his daughters "grow up in a world that has been so corrupted by evil" and that he had to stand up for them. Id. He told his daughters that he was trying to protect people who could not protect themselves, and that he hoped they would understand that someday. Id. The video shows that, during his drive to Washington, D.C., the defendant was lucid, deadly serious, and very aware that his planned confrontation would likely leave him dead or in jail.

A few hours later, at about 1:00 p.m., after the defendant texted her that he loved her, W-8 responded with additional admonitions.  See Exhibit G.

- "Well honestly Maddison idk what the f--k Ur doing it's really starting to freak me out[.]"

- "An if y went off and did something stupid which I figure u did bc Ur avoiding all my questions… Jus know that the ppl u love R suffering too back home an idk."

- W-8 then told the defendant to enjoy his "selfish lil adventure."

W-8's text messages left the defendant unmoved.  Id.  Around 2:00 p.m., he texted W-6 and W-7, asking, "If anything ever happens to me, yall will take care of my family, right?" and telling W-6 and W-7 that he loved them, and that they were his brothers.  See Exhibit H.

### **Impact of the Offenses**

Notwithstanding the mix of malicious and misguided information that spread over the internet both before and after this offense, Comet is a popular, family-friendly restaurant in Washington, D.C.  It is well known for its pizza, for live music events, and for the ping-pong tables that many customers and their children enjoy using before, during, and after their meals.  On Sunday afternoons in the fall, it is often busy with families eating, playing ping-pong, and watching football games on television.

When the defendant marched into the restaurant on Sunday, December 4, 2016, Comet was just that.  Despite the wild Pizzagate rumors spreading on YouTube and the related threats and harassment directed at the owner and employees of the restaurant, Comet was full of employees and customers that afternoon who knew better.  It was occupied by a diverse set of families and children who were eating, drinking, and playing games – a pleasant, peaceful, and quintessentially American atmosphere.  The defendant willfully disrupted that peace and terrified every one of

those people when he marched into the restaurant carrying a fully-loaded, three-foot long assault rifle, with his hand on the pistol grip and his finger by the trigger.

The defendant traumatized the employees and customers at the restaurant, and his crimes affected an entire community, leaving many people feeling threatened.  Comet has been compelled to hire a security guard, in large part because employees otherwise do not feel safe in their place of work.  A number of people who were in the restaurant continue to receive counseling.  As employee ("E-1") wrote on June 6, 2017:

> I find myself often bursting out into tears. I feel pure panic and terror some nights when the memories flood back without warning — of slamming fists on the expo window in order to alert the kitchen that there was a gunman inside, of frantically waving with my coworkers at customers to move toward the front door to exit, of running to the firehouse as the police cars came speeding down the street[.] …
>
> I had never seen a therapist or counselor prior to this crime.  I now see a trauma therapist once a week, and have seen her for the last four months. …
>
> I have obsessive thoughts about how that afternoon could have gone differently.  I have to be in the back room that the defendant tore apart to "investigate" every single shift and always think about what occurred in there.  I feel like I cannot escape those feelings until I leave this job, which may have to happen soon in order to maintain my sanity.  I should not have to leave the job I love.
>
> I feel like my life is forever changed.  I have worked really hard to establish myself in my career, the career I've dreamt about since I was a teen, and I feel like my accomplishments have been forever tarnished due to this crime.  That's one of the hardest parts of all of this that can never be remedied.  We were made part of history for all the wrong reasons.  I feel cheated.

Another employee ("E-2"), described the collateral effects of the defendant's nationally-reported crime.  E-2 addressed her June 7, 2017, statement directly to the defendant:

> I not hoping for a certain outcome [at sentencing], I'm here because my life changed after you came in. The national attention and hate that came with your poor choice was deafening. … every time conspiracy Theorists come up with something new, or Hillary

> mentions us, or even a joke [appears] on [Saturday Night Live,] it's
> as if we're rattling this scary cage, we immediately see an uptick in
> hate online and more crank calls. So even though this has all
> happened already, you still have the ability create a great deal of
> fear.

The impact of the defendant's crime was not limited to employees. For example, one father – a tourist who was eating with his family when the defendant entered the restaurant – reported that even three months after the event, his six-year old daughter had anxiety being in restaurants. The government expects to present additional, more specific victim statements at sentencing.

Beyond the harm directly caused by the defendant's crimes, the defendant's conduct appears to have inspired other malicious incidents. The defendant's assault was followed by an increase in threats against Comet, people associated with Comet, and nearby businesses. For example, on December 7, 2016, a Louisiana man called another business on the same city block and explicitly threatened to follow up on the defendant's assault, telling a restaurant employee, "I'm coming there to finish what the other guy didn't. I'm coming there to save the kids and then I'm going to shoot you and everyone in the place!" See Exhibit J (Arrest Warrant). The notoriety of the defendant's crimes magnified and perpetuated the impact of the Pizzagate rumors, and widened the impact on the community far beyond the people at the restaurant on December 4.

### Additional Relevant Evidence

The government respectfully submits the following additional evidence, including evidence referenced in the preceding sections as well as additional photographs and videos.

- Exhibit A.  Cellphone Extraction Report – defendant's cellphone.

- Exhibit B.  W-8 transcript.

- Exhibit C.  Cellphone Extraction Report – defendant's cellphone.

- Exhibit D.  W-6 transcript.

- Exhibit E.  Cellphone Extraction Report – W-6's cellphone.

- Exhibit F.  W-7 transcript.

- Exhibit G.  Cellphone Extraction Report – defendant's cellphone.

- Exhibit H.  Cellphone Extraction Report – W-7's cellphone.

- Exhibit I.  Defendant's video message.

- Exhibit J.  Arrest Warrant for Yusif Jones.

- Exhibit K.  Crime Scene photographs of Comet.

- Exhibit L.  Crime Scene photographs of the defendant's firearms.

- Exhibit M.  Victim impact statements.

## ARGUMENT

### I.      Introduction

The defendant pled guilty to Interstate Transportation of a Firearm or Ammunition ("Interstate Transportation") and Assault with a Dangerous Weapon ("ADW").  These charges each carry a maximum term of imprisonment of 10 years.  The government respectfully submits that a significant sentence is warranted under all of the circumstances of the case, and that 54 months in prison would appropriately punish the defendant for his actions, help keep the community safe, and deter other would-be vigilantes from engaging in similarly dangerous offenses.

### II.     The Legal Standards

#### A.  The Sentencing Guidelines

##### 1.   The Sentencing Guidelines For Count One (Interstate Transportation)

The United States Sentencing Guidelines ("U.S.S.G.") provide advisory recommendations which the courts "must consult . . . and take . . . into account when sentencing," United States v.

Booker, 543 U.S. 220, 264 (2005), defendants for violations of the United States Code.  As the

Supreme Court has explained, "[a]s a matter of administration and to secure nationwide

consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" in

for determining the appropriate sentence.  Gall v. United States, 552 U.S. 38, 49 (2007).

As set forth in the Presentence Report ("PSR"), the Probation Office determined that, after

accounting for the applicable specific offense characteristics and a three-point deduction for the

defendant's acceptance of responsibility, the offense level for Count One (Interstate

Transportation) is "15."[1]   The Probation Office further determined that the defendant has a

criminal history score of "0" under the U.S.S.G.   Finally, the Probation Office determined that,

based on the defendant's offense level and criminal history score, the U.S.S.G. recommended a

sentence of 18 to 24 months of imprisonment.  The government agrees with each of these

determinations.

2.   The Sentencing Guidelines For Count Two (ADW)

Whereas the United States Code and the U.S.S.G. are applicable to the defendant's

sentence for Count One, the defendant's sentence for Count Two (ADW) must be determined

according to the District of Columbia Code.  See United States v. Cutchins, 956 F.2d 1216, 1219

(D.C. Cir. 1992) (explaining that "the [U.S.S.G.] apply only to federal crimes under 18 U.S.C.

§ 3551(a)" and that "violations of the D.C. Code can only be sentenced under the D.C. Code.").

The District of Columbia Courts typically sentence felony violations of the D.C. Code with

reference to the D.C. Voluntary Sentencing Guidelines ("D.C.V.S.G.").   Pursuant to an

Administrative Order of the D.C. Superior Court, D.C. Superior Court judges are expected either

---

[1] As noted in the PSR, the defendant has fully accepted responsibility for his conduct in a timely manner. The United States therefore moves for the additional one-level reduction in the defendant's offense level. The calculations in the PSR accounted for this motion (at ¶ 47).

to follow the D.C.V.S.G. or, if they choose not to follow the D.C.V.S.G., to explain why they chose not to do so.  However, it should be noted that the D.C.V.S.G. are entirely voluntary, and an otherwise lawful sentence may not be appealed on the theory that the court misapplied the D.C.V.S.G.  Speaks v. United States, 959 A.2d 712, 717-20 (D.C. 2008).

As set forth in the PSR, the Probation Office determined that, under the D.C.V.S.G., the recommended sentences are based on two factors: the "Offense Group" of the offense, and the defendant's Criminal History Score.  The Probation Office determined that Count Two (ADW) is a Group Six Offense, that the defendant has a Criminal History Score of "0," and that given those two factors, the D.C.V.S.G. recommend a sentence of 18 to 60 months of incarceration.  The Probation Officer further determined that the D.C.V.S.G.-compliant sentence could be "prison only," "short split," or "long split."[2]  The government agrees with each of these determinations.

3.  Concurrent and Consecutive Sentences

The U.S.S.G. and the D.C.V.S.G. each provide a framework through which courts can determine whether sentences for multiple counts should run concurrent or consecutive.  However, the U.S.S.G. does not provide a framework for determining how to account for D.C. Code violations, and the D.C.V.S.G. does not provide a framework for determining how to account for U.S. Code violations.  The D.C. Circuit has held that, "[b]ecause the Guidelines are silent on the issue," it is a "matter of discretion" for the sentencing court.  Cutchins, 956 F.2d at 1219.

B.  The Statutory Sentencing Factors

As noted above, determining the recommended sentencing range under the U.S.S.G. is the

---

[2] A "short split sentence" involves an initial prison term between 0 and 6 months, a suspended prison term sufficient to bring the total prison sentence within the recommended sentencing range, and a term of probation that would be served upon release from the initial prison term.  A "long split sentence" similarly involves both an initial prison term and a suspended prison term, but both the initial and suspended terms must be within the sentencing guidelines range.

first of two required steps for sentencing under the United States Code.  The second step requires the court to consider that range, to consider other relevant factors set forth in the guidelines, and to consider the factors set forth in 18 U.S.C. § 3553(a).  See, e.g., United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).  These factors include (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public, and provides the defendant with needed educational or vocational training and medical care; and (4) the need to avoid unwarranted sentence disparities among defendants with similar records convicted of similar conduct.

The D.C. Code requires the consideration of similar factors.  D.C. courts must impose a sentence that (1) reflects the seriousness of the offense and the criminal history of the offender; (2) provides for just punishment and affords adequate deterrence to potential criminal conduct of the offender and others; and (3) provides the offender with needed educational or vocational training, medical care, and other correctional treatment."  D.C. Code § 24-403.01(a).  The D.C. Code does not adopt a factor that specifically addresses protecting the public, but protecting the public is certainly part of providing "deterrence to potential criminal conduct of the offender and others."

### III.    The Government's Recommended Sentence

The defendant pled guilty to Interstate Transportation of a Firearm or Ammunition ("Interstate Transportation") and Assault with a Dangerous Weapon ("ADW").  These charges each carry a maximum term of imprisonment of 10 years.  The government recommends concurrent sentences of 24 months for Count One and 54 months for Count Two, which would result in an overall sentence of 54 months (or 4½ years) in prison, to be followed by 3 years of supervised release.  The government also requests that the defendant be ordered to pay restitution.

However, in light of the Probation Office's determination that the defendant would be unable to pay any additional fine, the government believes that a fine would be inappropriate in this case.

### C. Analysis of the Statutory Sentencing Factors

#### 1. Nature and Circumstances of the Offense

The government submits that this factor weighs heavily in favor of a significant sentence for both Count One and Count Two.

First, the defendant's conduct was not only premeditated – it was the purposeful product of extended deliberation.  The defendant had been planning his confrontation at Comet since December 1, 2016, when his heated arguments with W-8 made clear that he was planning on doing "something stupid."  The defendant maintained his focus over the next three days, attempting to recruit W-6 (and making at least some effort to identify others who might be willing, including W-7 and any "army buddies" of W-6).  The defendant pushed ahead with his planned confrontation, despite pleas from W-8 that the defendant consider "the consequences" of his actions, and despite arguments from W-6 that a camera would be more effective than a firearm.  The defendant continued driving toward Washington, D.C., even after making videos and sending messages that made clear that he did not expect to return home.  In his words, he was ready to "sacrifice … lives" so he could make his mark.

Second, the defendant's premeditated conduct risked the lives of a large number of people. While he was alone inside Comet, the defendant fired an AR-15 at essentially point-blank range into a locked closet, without knowing whether or not anyone was behind the thin wooden door.  If anyone – for example, a customer or employee who never made it out of the restaurant – had been hiding inside the closet, they likely would have been struck by gunfire.  Moreover, the fact that the defendant did not shoot anyone, and that nobody else began shooting at him, was little more than

luck.  If an off-duty member of law enforcement had been on the scene, watching the defendant walk into a crowded restaurant with his hand on the pistol grip of an AR-15, she would have drawn her weapon and, at a minimum, demanded that the defendant drop his gun.  If the employees of Comet had not kept level heads and guided customers out of the restaurant in a peaceful and non-confrontational manner, one of them may have felt compelled to confront the defendant.  If CW-1 had not immediately run away, he might have felt compelled to confront the defendant.  If the owner of Comet, whose picture was widely circulated in connection with Pizzagate, had been at the restaurant, he may have confronted or been confronted by the defendant.  Any one of these scenarios would have created a tense and dangerous situation, and probably would have resulted in gunfire and serious to deadly injury.  As the defendant acknowledged in his Statement of Offense, he had contemplated an armed assault on anyone who was involved with Pizzagate or who "interfered with his ability to 'investigate.'"

Third, the defendant's conduct had a significant impact on the lives of numerous people – people who were inside the restaurant and people who were otherwise connected to the restaurant (such as the owner of Comet).   Some people who were inside the restaurant continue to require counseling; small children have the defendant and his gun imprinted on their memories, in at least once case causing anxiety around restaurants; employees have to work in a place in which they do not feel safe; and other people associated with the restaurant feel unsafe by extension.

Finally, in the context of the Pizzagate phenomenon, the defendant's conduct had a greater impact and meaning than similar conduct might have had during a robbery or personal dispute. The defendant knew about Pizzagate because it was a nationwide internet phenomenon followed and repeated by thousands of people (or perhaps "bots") on the internet.  The defendant must have known that his conduct would draw national attention and, if he had thought about it, he would

have known that his conduct was likely to inflame the situation – and that is precisely what happened.  The defendant's conduct directly threatened an entire neighborhood around Comet, including people who were affected by the closure of an entire city block, people who were part of the community that spent time at Comet, and people involved in other businesses in the area. The defendant's conduct had indirect effects as well, inspiring further crimes, such as the threat (which was directed to a different business on the same block) to "finish what the other guy didn't."

### 2.  History and Characteristics of the Offender

The defendant appears to be an intelligent and lucid adult, having been raised by a good family in a stable environment, having attended some college, and living with his family in a well-kept suburban home.  The defendant does not have any criminal history to speak of, and he has been employed on and off during his adult life.  A review of the PSR shows that there are no particularly mitigating circumstances in the defendant's character or background.

### 3.  The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, to Protect the Public

The circumstances of this case demand a significant sentence, in order to promote respect for the law, provide adequate deterrence to the defendant and others, and to protect the public. First, the defendant's decision to pursue a vigilante fantasy, rather than report a perceived crime to law enforcement, is a direct and unacceptable challenge to the rule of law.   The defendant himself, during his post-arrest interview, made clear that he had no respect for the public institutions of the District of Columbia, telling detectives that everyone in D.C. is "crooked." When he heard about or read about Pizzagate, he did not contact the FBI or local police – other people had, in fact, and appropriate officers of the Metropolitan Police Department and agents of the FBI had already investigated the Pizzagate allegations and determined that they were unfounded.  Instead of following that path, or even following the non-threatening path of a citizen

journalist by using a camera (as W-6 suggested two days before the defendant drove to Comet), the defendant armed himself and took the law into his own hands.

Second, as demonstrated by subsequent conduct that appears to have been inspired or intensified by the notoriety of the defendant's offenses, a significant sentence is required to afford adequate general deterrence and to protect the public. Beyond Pizzagate, the internet is full of wild conspiracy theories where people urge members of the public – such as the defendant and other Pizzagate threat-makers – to take action. A significant sentence is required to deter other people from pursuing vigilante justice based only on their YouTube feed.

Finally, the government submits that a significant sentence is required in order to justly punish the defendant for his assaultive conduct, for the danger that he imposed on others, and for the impact of his actions on the victims in this case.

### 4. The Need to Provide the Defendant with Educational or Vocational Training or Medical Care

The defendant would no doubt benefit from education or training, but nothing in the PSR shows that he has any unusual or particular need for education, training, or medical care that would impact the appropriate sentence. The government submits that the defendant should be evaluated for any counseling or therapy that would benefit him, but does not believe that the appropriate sentence is otherwise impacted by this statutory factor.

### 5. The Need to Avoid Unwarranted Sentence Disparities

Sentencing the defendant to 24 months for Count One and 54 months for Count Two is appropriate under the circumstances and would not result in unwarranted sentence disparities. First, government is not aware of any case involving conduct that is distinctly similar to the conduct in this unusual case. Second, the government submits that the Court can adequately avoid any potentially unwarranted sentencing disparities by imposing guidelines-compliant sentences,

particularly where, as here, the sentencing ranges are not unusually wide.  Finally, the government respectfully submits that concurrent sentences at the high end of the guidelines ranges are entirely appropriate in this case, particularly where they result in an effective sentence that is just above the midpoint of the combined guidelines ranges were the sentences to run consecutively.[3]  The violence contemplated by the defendant stands out for the Interstate Transportation charge, because that charge applies to transporting firearms with intent to commit any felony, whether or not said felony involves violence.  Similarly, the impact of the defendant's crimes stand out for the ADW charge – a charge which typically involves one-on-one conduct – because the defendant's conduct here impacted numerous victims, including people inside the restaurant that day, as well as those belonging to the wider community in and around Comet.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the government respectfully requests that the Court sentence the defendant to 24 months in prison for Count One and 54 months in prison for Count Two, and that the sentences run concurrently with one another.  The government further requests that the Court sentence the defendant to three years of supervised release, to pay restitution for property damage suffered by Comet, and to pay the required special assessments of $100 costs each for both Counts One and Two.

---

[3] While its recommended sentences are at the high end of the guidelines-compliant ranges for each count, the government's overall recommendation is within the middle third of guidelines-compliant sentences.  The lowest guidelines-compliant sentence would entail concurrent sentences of 18 months; the highest guidelines-compliant sentence would require consecutive sentences totaling 84 months; and the recommended sentence of 54 months would be just above the mid-point of 51 months for a consecutive sentence.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY
D.C. Bar Number 415793


By: _____/s/_____
DEMIAN S. AHN
Assistant United States Attorney
D.C. Bar Number 49111
United States Attorney's Office
555 4th Street NW
Washington, D.C. 20530
Tel. No.: (202) 252-7106
E-mail: demian.ahn@usdoj.gov

SONALI D. PATEL
Assistant United States Attorney
N.Y Bar Number 4844049
United States Attorney's Office
555 4th Street NW
Washington, D.C. 20530
Tel. No.: (202) 252-7032
E-mail: sonali.patel@usdoj.gov