1

```
 1                   UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2


 3


 4    UNITED STATES OF AMERICA,          :
                                         :
 5                    Plaintiff,         :
                                         :   CR NO. 16-232
 6    v.                                 :
                                         :
 7    EDGAR MADDISON WELCH,              :
                                         :
 8                    Defendant.         :
      ------------------------------------------------------
 9                   TRANSCRIPT OF SENTENCING

10         BEFORE THE HONORABLE KETANJI BROWN JACKSON

11             UNITED STATES DISTRICT JUDGE

12                  Thursday, June 22, 2017

13    APPEARANCES:

14      For the Plaintiff:   Demian Shipe Ahn, Esq.
                             U.S. ATTORNEY'S OFFICE
15                           Violent Crimes Narcotics and
                             Trafficking (VCNT)
16                           555 Fourth Street, NW
                             Washington, DC 20530
17
                             Sonali D. Patel, Esq.
18                           U.S. ATTORNEY'S OFFICE FOR THE
                             DISTRICT OF COLUMBIA
19                           555 Fourth Street, NW
                             Washington, DC 20530
20
      For the Defendant:     Danielle Courtney Jahn, Esq.
21                           FEDERAL PUBLIC DEFENDER FOR THE
                             DISTRICT OF COLUMBIA
22                           625 Indiana Avenue, NW
                             Suite 550
23                           Washington, DC 20004

24    Proceedings reported by machine shorthand, transcript
      produced by computer-aided transcription.
25
```

1               P R O C E E D I N G S

2          DEPUTY CLERK:  Your Honor, this is Criminal

3    Case 16-232, United States of America v. Edgar Maddison

4    Welch.  We have Demian Ahn and Sonali Patel for the

5    government; Dani Jahn for the defendant; probation

6    officer, Kathie McGill.

7          THE COURT:  Good morning.  We are here for the

8    sentencing of the defendant, Mr. Edgar Maddison Welch,

9    who has pled guilty to one count of interstate

10   transportation of a firearm and ammunition in violation

11   of Section 924(b) of Title 18 of the United States Code

12   and one count of assault with a dangerous weapon in

13   violation of Section 402 of Title 22 of the D.C. Code.

14          The Court has received and reviewed the

15   probation report and the sentencing recommendation of

16   the probation office and also various documents that

17   have been submitted by counsel in advance of this

18   hearing, including sentencing memoranda from the

19   government and the defense, both initial memoranda and

20   reply briefs, and also multiple exhibits that included

21   such matters as letters, also photos and even a video

22   from the government.

23          It appears as though the parties have engaged

24   in the process of reviewing the presentence report and

25   that the final report is complete.

3

1          Now, Mr. Welch, I always start my sentencings

2     by addressing the defendant directly, because it is

3     important among all the people who are here and all the

4     things that are going on that you understand what's

5     happening here today.

6          This sentencing hearing will essentially

7     proceed in four steps.  The first step at today's

8     hearing is for the Court to determine whether you have

9     reviewed the presentence report along with your counsel

10    and whether there are any outstanding objections to the

11    factual recitations that are set forward in the report

12    and also to the probation office's calculation.

13         The second step is for the Court to make its

14    own determination regarding what the sentencing

15    guidelines and sentencing ranges say about the range

16    that applies in your case based upon your criminal

17    history and considering any mitigating or aggravating

18    factors that exist in those guidelines.

19         These are voluntary guidelines, as I'm sure

20    your counsel told you, but the Court must calculate and

21    consider them in every case.

22         The third step is to hear from the government,

23    from the witnesses that the government may have decided

24    to introduce, from your counsel, from any witnesses that

25    you may want to put forward, and from you if you would

1    like to be -- to say something that the Court should

2    consider in regard to the sentencing.

3           And then the last step requires this Court to

4    fashion a sentence that it considers fair and just in

5    light of the various factors that Congress has set

6    forward in statutes and that appear in the D.C. Code.

7    As part of this last step, the Court will actually

8    pronounce the sentence and also other required aspects

9    or consequences for this offense.

10          Now, as I go through this process, I realize

11   that it is sometimes hard for nonlawyers to follow some

12   of the processes, especially with respect to the

13   guidelines because they can be very mechanical.  But I

14   also always say to defendants that it is really

15   important for you to keep in mind, despite all of the

16   mechanical talk, why we're here.

17          We are here -- and this is a very serious

18   matter -- because you have committed and pled guilty to

19   conduct that constitutes a federal crime and a D.C.

20   crime.  And so it's important for you to know and to

21   understand that today's process is fundamentally about

22   the consequences that you have to face as a result of

23   your decision to engage in criminal behavior in

24   violation of federal law and D.C. law.  All right?

25          So starting with the presentence report.  The

1    final presentence report and sentencing recommendation

2    in this matter was filed on June 1 of 2017.

3           Let me start by asking government counsel

4    whether the government has any objection to the factual

5    determinations set forth in the presentence report.

6           MR. AHN:  We do not, Your Honor.

7           THE COURT:  All right.  Let me ask Ms. Jahn --

8    well, first let me talk to Mr. Welch and ask him whether

9    he's fully satisfied with his attorney in this case.

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  All right.  And do you feel that

12   you've had enough time to talk with her about the

13   presentence report and about sentencing?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  All right.  So you may have a

16   seat.

17          Ms. Jahn, have you and your client read and

18   discussed the presentence report?

19          MS. JAHN:  We have, Your Honor.

20          THE COURT:  And do you have any disputed

21   issues of fact regarding the information that is put

22   forward in that report?

23          MS. JAHN:  There are no disputes, Your Honor.

24          THE COURT:  All right.  So hearing no

25   objections to the facts as stated in the presentence

1   report, the Court will accept the factual recitation in

2   that report regarding the circumstances of the offense.

3   And, therefore, the facts as stated in the presentence

4   report will be the Court's findings of fact for the

5   purpose of this sentencing.

6           Now, in addition to setting out various facts

7   related to the crimes at issue and also to the

8   defendant, the presentence report lays out the probation

9   office's calculation of the advisory guideline ranges

10  that apply in this case.  That calculation was done

11  using the 2016 guidelines manual -- and that's the

12  federal guidelines -- and then also the District of

13  Columbia voluntary guidelines.

14          And at this point, I will lay out the

15  probation office's calculation.

16          Beginning with the guideline offense level for

17  Count I, the applicable guideline for Count I in this

18  case is 2K2.1(a)(7), which has a base offense level

19  of 12.

20          According to the presentence report, two

21  specific offense characteristics apply.  First, because

22  the offense involved three firearms, two levels are

23  added.  In addition, because Mr. Welch used or possessed

24  the firearm in connection with another felony offense,

25  four levels are added.

1           The government has also represented that

2    Mr. Welch has demonstrated acceptance of responsibility

3    in a manner that entitles him to a two-level reduction

4    under 3E1.1(a) and that Mr. Welch timely notified the

5    government of his intention to plead guilty in a manner

6    that entitles him to an additional one-level reduction

7    under 3E1.1(b).

8           Therefore, prior to the consideration of any

9    departures or variances, Mr. Welch's total offense level

10   for Count I is 15.

11          Is there any objection to the calculation of

12   this offense level?

13          MR. AHN:  No, Your Honor.

14          MS. JAHN:  No, Your Honor.

15          THE COURT:  All right.  Count II -- and that

16   was for Count I.  Count II is the state count, and the

17   Court must look at the D.C. voluntary guidelines in

18   order to determine that range.

19          According to the presentence report, under

20   those guidelines, the charge of assault with a dangerous

21   weapon is an M6 offense, which yields a sentencing range

22   when paired with the defendant's criminal history score.

23   Let me determine what the PSR says about that range.

24          I believe it is 18 to 60 months; is that

25   correct?

1          MR. AHN:  That is correct, Your Honor.

2          THE COURT:  Ms. Jahn?

3          MS. JAHN:  That's correct, Your Honor.

4          THE COURT:  All right.  Turning to the

5     applicable criminal history category with respect to the

6     federal guidelines, the presentence investigation report

7     has found that Mr. Welch has zero prior convictions that

8     receive criminal history points in the guidelines

9     manual.  And that results in a criminal history point

10    subtotal of zero, which would place Mr. Welch in

11    Criminal History Category I.

12          Now, I noted that, in the plea agreement, the

13    parties acknowledged that Mr. Welch does have one prior

14    conviction for driving while impaired, and that was a

15    2013 conviction.  And he was sentenced to a term of

16    probation for that offense.

17          This conviction would ordinarily be assessed

18    one point under the guidelines.  The probation office

19    did not have the documentation related to that offense

20    at the time the report was issued.  And so that's, I

21    think, why it was not accounted for in the probation

22    report.

23          But as far as the Court can tell, it's not

24    material because, even if that one point was assessed,

25    Mr. Welch would still be in Criminal History Category I.

1        Am I correct about that, Mr. Ahn?

2        MR. AHN:  Yes, Your Honor.

3        MS. JAHN:  Yes, that's correct.

4        THE COURT:  All right.  So we have Criminal

5   History Category I.

6        Under the D.C. voluntary sentencing

7   guidelines -- and I addressed the ranges before -- just

8   focusing on the criminal history category, Mr. Welch has

9   a total criminal history score of zero, which puts him

10  under Column A.  And he would have gotten an additional

11  quarter point under those guidelines for the previous

12  offense, but that still kept him in the same category.

13       All right.  So is there any objection to the

14  PSR's criminal history category for either set of

15  guidelines?

16       MR. AHN:  No, Your Honor.

17       MS. JAHN:  No objection, Your Honor.

18       THE COURT:  Okay.  So the applicable

19  sentencing range for Count I under the federal

20  guidelines, given a criminal history category of I and

21  an adjusted offense level of 15, is 18 to 24 months of

22  imprisonment for that count.

23       And as mentioned for Count II, given a

24  criminal history score of A and an M6 offense, the

25  applicable sentencing range under the D.C. voluntary

1    guidelines is 18 to 60 months.

2              So am I right about where we're starting in

3    terms of the guidelines?

4              MR. AHN:  Yes, Your Honor.

5              MS. JAHN:  You are correct.

6              THE COURT:  All right.  So the next thing we

7    have to consider is departures.  You know that I

8    distinguish, as many courts do, between departures and

9    variances.

10             The PSR, the presentence report, doesn't

11    include any departure grounds and neither party has

12    mentioned any perhaps because of your plea agreement.

13    But this is an opportunity for either side to assert a

14    departure if you wish to do so.

15             Mr. Ahn?

16             MR. AHN:  The U.S. Government does not wish

17    to.

18             MS. JAHN:  The Court is correct.  The plea

19    agreement precludes any departures in this case.

20             THE COURT:  All right.  But, again, we're

21    distinguishing in variances, and we'll talk about that

22    in a moment.

23             Now, Section 3553(a), which is the statute

24    that governs this Court's consideration of the federal

25    offense, includes a variety of factors and requires the

1    Court to consider a number of things, including the

2    sentencing range that the guidelines prescribe, which

3    I've just discussed, and also the applicable penal

4    statutes.

5          So in my sentencings, I typically take a

6    moment to describe generally the applicable statutory

7    and guideline penalties for the offenses at issue.

8          The charge of interstate transportation of a

9    firearm and ammunition in violation of 18 U.S.C. 924(b)

10   carries a statutory maximum penalty of ten years of

11   imprisonment.  The charge of assault with a dangerous

12   weapon in violation of 22 D.C. Code 402 also carries a

13   statutory maximum penalty of ten years.

14         If a term of imprisonment is imposed, the

15   statutes provide that the defendant faces a maximum

16   period of supervised release of three years for Count I

17   and three years for Count II.

18         Now, I wanted to check this, because it

19   appears that, in the defense counsel memoranda, there

20   was some representation that a five-year period of

21   supervised release was applicable.  In the statute, I

22   think that only if certain conditions are met, including

23   the statutory minimum being for an offense of -- oh,

24   sorry -- the statutory maximum being for an offense of

25   25 years or more, that's a precondition for the

1    five-year period of supervised release.

2           So I didn't take away from the statutory

3    schemes at issue that five years of supervised release

4    is required.

5           Ms. Jahn, I don't know whether you wanted to

6    speak to that since you had made that representation.

7           MS. JAHN:  Your Honor, I'd just reference

8    Paragraph 120 --

9           THE COURT:  Yes.

10          MS. JAHN:  -- of the presentence report, the

11   second sentence.  That indicates that if the Court does

12   impose a sentence of one year or less, then the Court

13   shall impose a term of supervised release of not more

14   than five years.

15          THE COURT:  Of not more than.  I'm sorry.  All

16   right.

17          So it's not that it's a required five-year

18   term?

19          MS. JAHN:  Correct.

20          THE COURT:  Okay.  So I think we're clear.

21   Perhaps the upper limit might be five years.  Might be.

22   But in any event, there's not a mandatory five-year

23   period of supervised release.

24          Am I correct about that, Mr. Ahn?

25          MR. AHN:  I believe it's correct that a

1    five-year release is not -- I believe it's three years,

2    but the Court has the statute in front of it.  I don't.

3              THE COURT:  Yes, I don't either.  We operate

4    in the federal system and not under the D.C. Code, which

5    is why we're all a little confused about this.

6              But I think nobody believes that there is a

7    minimum amount of five years as supervised release,

8    correct?

9              MS. JAHN:  That's right, Your Honor.

10             MR. AHN:  That's correct, Your Honor.

11             THE COURT:  Okay.  All right.

12             MS. JAHN:  Your Honor, I want to be crystal

13   clear on the record that if the Court -- depending upon

14   the mathematics that go into the sentence, if the Court

15   gives a particular sentence of one year or less, this

16   Court can impose up to five years of supervised release

17   on the D.C. Code alone.

18             THE COURT:  That, I don't know.

19             MS. JAHN:  That's what I'm told.

20             THE COURT:  That's what you're submitting.

21             Mr. Ahn, what do you think?  You thought it

22   was three years.

23             I read the statute "up to three years," which

24   actually benefits your client, Ms. Jahn.  But in any

25   event, I'm not sure that it matters necessarily in this

1    case.

2              You understand?

3              MS. JAHN:  I do understand, Your Honor.

4              THE COURT:  All right.

5              MS. JAHN:  I just wanted it to be clear for

6    the record.

7              THE COURT:  For the record.  And you are

8    referencing paragraph 120 of the probation department

9    report.

10             Ms. McGill, did you want to speak to that at

11   all?

12             PROBATION OFFICER:  Your Honor, I believe the

13   representations made by the parties are correct.

14             THE COURT:  Okay.  So I'm not going to dwell

15   on that because we're talking about maximums, not

16   minimums.

17             Let me say that the statutes of conviction set

18   maximum fines as well, up to $250,000 for Count I, up to

19   $25,000 for Count II.  The guideline fine range is

20   between 7,500 and $75,000 for Count I, and there is no

21   applicable guideline provision for Count II regarding

22   fines.

23             Turning to restitution.  The parties in this

24   matter have agreed to a restitution amount of $5,744.33

25   to be paid to Big Bucks, LLC.  And my understanding,

1    based on the parties' representations, is that this

2    amount is based on various property damage that Big

3    Bucks, LLC, suffered as a result of this crime.

4         Now, the Mandatory Victims Restitution Act

5    requires the Court to order restitution to victims of

6    certain offenses, including offenses that may be

7    characterized as crimes of violence, such as assault

8    with a deadly weapon.  The statute has various criteria.

9         Let me ask Mr. Ahn just to state for the

10   record how the parties agreed upon this restitution

11   figure.

12        MR. AHN:  Thank you, Your Honor.  The parties

13   reviewed documentation that was submitted by an

14   insurance company associated with the victim restaurant,

15   Comet Ping Pong.  And based on the information at the

16   time, we've identified the appropriate number.  And I

17   believe the information that would distinguish between

18   monetary losses suffered by the insurance company and by

19   the owner of the Comet Ping Pong restaurant has been

20   provided to the probation officer.

21        THE COURT:  So it's sort of the replacement

22   value is what you think?

23        MR. AHN:  It is the replacement value.  And,

24   actually, we later found out that it did not cover --

25   that there was an additional round of costs that were

1    incurred by the insurance company in particular, but the

2    documentation has not been submitted.

3         So the only documentation that we have at this

4    point was the approximately $5,400 in damages based on

5    physical damage to property at the restaurant.

6         THE COURT:  All right.  So it's the minimum

7    amount, you think?

8         MR. AHN:  It is, yes.

9         THE COURT:  All right.  Ms. Jahn, did you have

10   anything to add?

11        And I'll have you come to the lectern if you

12   have something to say.

13        MS. JAHN:  No, Your Honor.  Just prior to the

14   plea in this case, government counsel tendered the

15   insurance documents that reflect that 5,744 figure.  And

16   we took no issue, did not challenge it, and just agreed

17   to pay that money with regard to restitution.

18        So there's no issue on the part of the defense

19   with that amount.

20        THE COURT:  Okay.  Great.  And this is the

21   basis -- this is the only victim for the purpose of

22   restitution in this matter?

23        MR. AHN:  Correct, for the purpose of

24   restitution.

25        THE COURT:  But does the government -- you're

1    going to have to come to the microphone.  I think other

2    people are trying to hear, and they can't do so when

3    you're --

4              MR. AHN:  Very well, Your Honor.

5              THE COURT:  Yes.

6              MR. AHN:  For the purposes of restitution,

7    yes, it's the one entity that suffered property losses,

8    which would be the proper subject of restitution.

9              THE COURT:  But it's not the government's

10   position that this is the only victim in this matter?

11             MR. AHN:  Certainly not, no.  That's -- the

12   corporate entity is the victim that suffered property

13   losses, but then there are numerous people who were

14   directly impacted by the defendant's crimes and who are

15   victims that we hope to present some statements, some

16   information from to the Court today.

17             THE COURT:  All right.  Thank you, Mr. Ahn.

18             Ms. Jahn, there is one more thing I wanted to

19   discuss with you related to restitution.  If you would

20   come forward.

21             I just wanted to know whether you wanted to

22   discuss payment schedule for the restitution.  Sometimes

23   the Court puts that in its restitution order.

24             MS. JAHN:  At this time, no, we're not asking

25   for any payment.  He's indigent.  He's incarcerated.  He

1    has no source of income.  So...

2            THE COURT:  No, I mean a schedule.

3            MS. JAHN:  Oh, a schedule.

4            THE COURT:  Like over time -- you know,

5    sometimes it's $50 a month or whatever it is.  I can

6    look and see what I've done in other cases, but I'm just

7    curious as to whether you have an opinion about how much

8    should be ordered when.

9            MS. JAHN:  So I think my opinion is it's very

10   hard to tell what the future is going to hold and what

11   ability to pay Mr. Welch will have.  We could just pick

12   a number.  Frankly, I think that's what we do sometimes

13   is $50 or $100 a month.  And then probation will do a

14   financial assessment upon release to see if that figure

15   is appropriate.

16           I think just at this point it's just too

17   premature to select a number.  So if we could just say

18   at the discretion of the probation office, perhaps that

19   would be sufficient.

20           THE COURT:  All right.  I will check with

21   probation as to whether or not that suffices in terms of

22   my final order before I give it.

23           But based on what I have recited with respect

24   to the statutory and guideline framework, let me ask

25   counsel if I have accurately stated those boundaries in

1    this case.

2              MR. AHN:  Yes, Your Honor.

3              MS. JAHN:  Yes.

4              THE COURT:  All right.  So before I discuss

5    the other sentencing factors that will bear on the

6    Court's final decision, at this point, pursuant to a

7    presentencing order that the Court issued, I will notify

8    the parties of the particular sentence that the

9    probation office has recommended in regard to this

10   matter, which takes into account, from their

11   perspective, the applicable guideline range, the

12   available sentences, and all of the factors in

13   Section 3553(a).

14              In this instance, the probation office has

15   recommended a term of imprisonment of 18 months on

16   Count I and 18 months on Count II to run concurrently

17   and a term of supervised release of 36 months on each

18   count also to run concurrently.

19              I want to be clear for the record that the

20   recommendation of the probation office is not based on

21   any facts or circumstances that have not already been

22   revealed to the parties in the presentence report.

23   Moreover, as you know, the probation office's

24   recommendation is not binding on the Court.

25              So at this point, the Court would like to give

1   the parties the opportunity to address the sentencing

2   guidelines calculation or the Court's consideration of

3   any of the factors under 3553(a).  I understand, at

4   least in one of the documents, the government has

5   represented that it may have witnesses that it's invited

6   to speak as well.

7           Is that correct, Mr. Ahn?

8           MR. AHN:  Victims for victim impact

9   statements.  Yes, Your Honor.

10          THE COURT:  Victims for victim impact

11  statements.  Well, this would be the opportunity if the

12  government wishes to come forward to speak about the

13  application of the factors and to present your victim

14  statements.

15          MR. AHN:  Thank you, Your Honor.  With the

16  Court's permission, what we'd like to do is to first

17  present our allocution as to the nature and

18  circumstances of the offense.

19          THE COURT:  Let me have you speak right into

20  the microphone.

21          MR. AHN:  With the Court's permission, we'd

22  like to first present our allocution about the nature

23  and circumstances of the offense followed by --

24  Ms. Patel will present victim impact statements.

25          THE COURT:  That's fine.

1          MR. AHN:  At the conclusion of that, we'll

2    make our sentencing request.

3          THE COURT:  All right.

4          MR. AHN:  Thank you, Your Honor.  On

5    December 4 last year, Comet Ping Pong was a beloved

6    neighborhood restaurant serving pizza.  It had been the

7    subject of vicious harassment and unfounded Internet

8    rumors, but the people of this city knew better.

9          So on that Sunday afternoon, people from

10   Washington, D.C. and, in fact, some tourists from other

11   places were eating pizza with their families at Comet in

12   peace.  The defendant shattered that peace.

13         He committed an armed invasion of a

14   family-friendly pizza restaurant.  Carrying two fully

15   loaded firearms, he engaged in shooting.  He shot an

16   assault rifle point blank at a wooden door not knowing

17   whether or not anybody or anything was behind the door.

18   And then he turned his assault rifle on an innocent

19   employee who was just trying to bring in a bucket of

20   pizza dough.

21         He was inspired by an Internet conspiracy

22   theory, but he was also motivated by and displayed utter

23   disrespect and contempt for the law and the public

24   institutions of this city which he called entirely

25   corrupt.  He traumatized everyone in the restaurant that

1  afternoon.  He inspired other would-be vigilantes, and

2  he terrified the entire Comet community.

3         And now, after he pled guilty, when he's been

4  given the opportunity to provide a fully truthful

5  explanation and apology for his conduct, he hasn't done

6  that.  He balked.  He claimed that he never meant to

7  hurt anyone, that he just failed to think through the

8  repercussions of his actions.

9         And right now, I'd like to briefly highlight

10  some of the evidence which contradicts those claims

11  which shows the true nature and circumstances of the

12  defendant's conduct.

13         Now, the crime that the defendant committed on

14  Sunday, December 4, didn't begin that day.  It didn't

15  begin on Sunday.  It wasn't Sunday morning, a

16  spur-of-the-moment decision.  It was something that he

17  had been thinking about for at least three days.

18         So it started, from the evidence, on at least

19  Friday -- excuse me -- Thursday, December 1.  And it

20  started -- from the evidence, in the afternoon, the

21  defendant spent hours watching YouTube videos on his

22  phone, browsing the Internet.  It started, you can see

23  up here on the screen, with the defendant -- you can see

24  there are YouTube extracts displayed on the phone.  This

25  is from the defendant's cell phone.

1          And after watching YouTube for over an hour,

2     the defendant texted his girlfriend saying that he had

3     been looking up on PizzaGate and it was making him sick.

4     He continued watching YouTube videos.  And then about

5     20 minutes later, the girlfriend responded, Stop it.

6     Stop obsessing over this.  Stop it.

7          But he didn't stop.  He continued watching the

8     same videos.  And hours later, after he'd looked up some

9     maps -- something on maps using his phone after he'd

10     gone to the Comet Ping Pong website, he continued

11     watching YouTube videos and then tried to get other

12     people involved.

13          At about 8:12 that night, he texted a friend,

14     who we've referred to in papers as W7, inviting him to

15     watch "PIZZAGATE:  The Bigger Picture" on YouTube.  He

16     texted another friend saying that he wanted to meet with

17     the two friends together in person the next day about

18     something very important about PizzaGate.  That's how he

19     characterized it.

20          And later that evening, after he was off the

21     phone, he met up with his girlfriend or maybe gave her a

22     ride home from work.  And he tells her what he's

23     thinking.  He tells her what he's looking at.  He tells

24     her about PizzaGate.  He tells her or shows her videos

25     showing some sort of human trafficking conspiracy

1    involving Hillary Clinton and John Podesta, ridiculous

2    claims that he had seen on YouTube.  And he tells his

3    girlfriend he wants to do something about it.

4         And playing the sensible role in the

5    conversation, the girlfriend is begging him to consider

6    the consequences.  She gets the distinct impression,

7    without remembering exactly what he was telling her,

8    that he was about to do something stupid and she wanted

9    him to stop and think.  They argued, which apparently

10   was unusual for the two of them, late into the night.

11        And it went on the next morning.  It went on

12   into Friday, not the argument between the defendant and

13   the girlfriend.  He decided to stop, apparently, talking

14   to her about it.  But he reestablished contact with his

15   friends, W6 and W7, and said he wanted to get them

16   involved.

17        He texted with his best friend, W6, asking him

18   if there were any Army buddies that he had who were down

19   for a cause.  And then when he was asked what's the

20   cause, he sent this text to W6 in which he makes clear

21   exactly what it is that he wants to do.  And it makes

22   clear that he considered the consequences of his

23   actions.

24        He had actually done what his girlfriend had

25   told him to do and thought about what it was he was

1   doing.  And he made clear in this text that he thought

2   it was worth it, possibly sacrificing the lives of a few

3   for the lives of the many.

4        It's not that he hadn't thought about the

5   consequences.  He thought about them, and he thought

6   that the ends justified the means.  His YouTube feed

7   justified the violence that he was contemplating.

8        And the text wasn't the end of it.  He then --

9   his friend invites him over.  He goes to the friend's

10  house, and the friend is now playing the voice of

11  reason.  He tells -- he doesn't directly confront the

12  defendant with everything, but he takes a different

13  approach, telling him, Well, you got to do some recon

14  first; take a camera, a camera would be better than a

15  gun.  He warns him not to go in guns blazing.

16        The defendant was not persuaded.  He told W6

17  that he was going to do essentially what ended up

18  happening.  And despite the best efforts of his best

19  friend, he could not -- he wouldn't change his mind.

20        So what we then have is the offense or the

21  planning, the premeditation continuing on into Sunday,

22  so about two days later.  And Sunday morning, the

23  defendant begins by inviting another friend, who we've

24  referred to as W7 -- another friend to come with him to

25  Washington, D.C., come with him to Comet Ping Pong.  And

1    the friend isn't interested.  He says maybe sometime

2    we'll go to D.C. on a road trip, but he's not going

3    anywhere now.  He had a job.

4            That didn't change the defendant's mind

5    either.  He went back home, and he actually sent a text

6    message which indicates his state of mind that morning.

7    He sent a Bible quote from the Book of Isaiah which

8    speaks about being the anointed one and about God's

9    anger against enemies.

10           The defendant took the -- is a very religious

11   person by all accounts, and this quote was meaningful to

12   him.  And it shows what was on his mind that morning as

13   he prepared to leave his house.

14           And so that he could display God's anger, in

15   his view, he armed himself.  He armed himself not with

16   one, not with two, but with three fully loaded firearms,

17   including this AR-15 style assault rifle which had 29 or

18   30 rounds in the chambers.  He armed himself and he

19   prepared -- he got into a car, and he prepared for a

20   long drive.  It was about 360 miles, five and a half

21   hours, between his hometown and Comet Ping Pong.  And

22   according to things he told police, he drove straight

23   through.

24           Anywhere in that time frame, he could have

25   turned around.  He could have changed his mind, or he

1    could have kept going but used a phone instead of a gun

2    the way that his friend had told him.  But he didn't.

3           He was focused and he was determined.  And

4    about two hours into the trip, he recorded a video which

5    the Court made some reference to.  And we'll play a

6    brief excerpt of it here because -- not for the

7    particular words, but I'd ask the Court to focus on the

8    defendant's demeanor.

9                    (Videotape played)

10          MR. AHN:  So it's not possible to hear the

11   words over the system right now.  What he's saying is

12   essentially good-bye to his family, mom, dad.  He names

13   a whole bunch of other folks.  And he tells them he

14   loves them and he hopes he gets to tell them again.  But

15   if he can't, he hopes they won't forget it.

16          What the entire content of the video in terms

17   of the words the defendant used makes clear is that he

18   knew he probably wasn't coming home, he would either be

19   dead or in a hospital or in prison.

20          And it's a two-minute -- approximately

21   two-minute video in which you can see the defendant is

22   calm, he's deliberate, he's picking his words carefully.

23   He's certainly emotional.  But in a very calculated

24   manner, he says good-bye or I love you to his family.

25   He's deadly serious.

1          And even two hours later, he's not changing

2     his mind.  As the day goes on, his girlfriend has

3     figured out that the defendant snuck out while she was

4     asleep, roughly speaking, and left his kids with her and

5     drove away.

6          And as the day goes, she gets increasingly

7     frustrated and scared, concerned about the man that she

8     calls the love of her life and about herself and the

9     kids.  And she figures out, you know, I know you're

10    going out and doing something stupid and she's pleading

11    with him.  She's sending these text messages hoping that

12    he's going to stop.  And then at the end he's just

13    frustrated -- she's just frustrated with his selfish

14    adventure, which is exactly what this was, something the

15    defendant had decided to do on his own regardless of the

16    fact that nobody would join him and that everybody said

17    it's not a good idea.  He hasn't changed his mind.

18         So even after these text messages, his mind is

19    made up and he sends another round of messages to his

20    same friends, W6 and W7.  If anything ever happens to

21    me, you-all will take care of my family, right?  He's

22    concerned about his family in the text message, but his

23    mind is made up.  He knows something is going to happen

24    to him.  He's going on a mission that he's probably not

25    coming back from, and he's prepared to do it.

1          He has thought about the consequences, and

2     he's going forward.  And he doesn't change his mind even

3     when he gets to Comet.  He doesn't change his mind when

4     he pulls up to the scene.

5          And this is the restaurant right now.  I don't

6     know exactly when this picture was taken, but the

7     restaurant could have looked just like that when the

8     defendant parked his car in front of the tree.  And the

9     restaurant had customers that day.

10          Despite the fact that there were rumors and

11     this harassment and threats that the restaurant was

12     going through because of this PizzaGate conspiracy

13     theory that was floating around on the Internet, the

14     community knew better.  And this sign was up in the

15     restaurant on the wall when the defendant walked in

16     because people knew better.  And they stood with their

17     local restaurant, one which they loved and went to and

18     spent time with their families at.

19          That is the restaurant the defendant entered,

20     and this is the scene that the defendant saw minus all

21     the people.  People had been eating.  You can see here

22     plates on the tables and cups half drank and half-eaten

23     items.

24          If you go in, there was somebody who was

25     working on a laptop.  People were sitting at the bar

having some pizza.  People's lunches got interrupted out by the ping pong tables, which you can see.

And, in fact, people had been playing ping pong.  A family of four, two adults and -- the parents and two children were playing ping pong when the defendant walked into that restaurant with his assault rifle.

Fortunately for everybody involved, the restaurant employees were incredibly professional and brave.  They didn't panic.  They didn't confront Mr. Welch.  They knew what he was up to.  They perceived the threat immediately when they saw that gun.  And they shepherded everybody out without anyone confronting or interfering with the defendant in any way.

So the restaurant emptied, and the defendant was able to roam around the place looking for this imaginary set of criminals that he'd heard about on YouTube.

And he was able to do that because everybody left.  And until he encountered a locked closet door, which is shown here -- there's a little hallway, it's not very long -- between the edge of the -- the beginning of the hallway and this red door that is displayed at the top of the screen, 5 or 6 feet, something along those lines.

1          And the defendant saw this locked door, which

2     actually, if you climb up, you can see over.  But the

3     defendant -- that wasn't what he did.  What the

4     defendant did was he took his assault rifle, this one

5     that's displayed here, and he fired two or three or four

6     times into that door at point-blank range, striking

7     through the door.  And this is a thin wooden door.  And

8     you'll see the power of the bullets as they crashed

9     through it tearing the lock, destroying the outer part

10    of the door.  And then it was powerful enough actually

11    to go -- once the bullet had gone through the door into

12    this metal computer casing, gone right through it.  It

13    actually went through some of the drywall.

14          And you can imagine if somebody had been in

15    the restaurant and not made it out and decided to hide

16    in the closet from somebody roaming around with a gun,

17    if they were hiding behind that door, their exit wound

18    might have looked something like this, which is the back

19    of the door.

20          Now, even after that, the defendant wasn't

21    finished.  Even after firing his weapon into there, he's

22    back in the hallway, I think, still trying to access the

23    room.  Because although he blew holes in the door, he

24    wasn't able to access it in that way.

25          And he's standing in that hallway when an

1    employee who had no idea what was going on, who had been

2    in a nearby restaurant getting dough, walked in carrying

3    a bunch of dough, opens the door.  And he's immediately

4    confronted by the defendant with this assault rifle,

5    which has been cleared by the marshals now.

6             This 3-foot-long assault rifle in this tiny

7    hallway, 5 or 6 feet long, is directly pointed at this

8    employee who is terrified and whose first thought is of

9    the Orlando Pulse shooting at the nightclub which killed

10   dozens of people.  And he thinks about that because

11   that's what these assault rifles are capable of.

12            And when you see somebody in your restaurant

13   where a firearm's not allowed and somebody is walking

14   with that gun, your first thought is -- and his thought

15   was I'm going to die.

16            Now, miraculously he does not rush the

17   defendant.  He does not interfere with the defendant.

18   He just immediately runs away before anything else could

19   happen.  And so he wasn't physically harmed.  But as he

20   ran to hide with employees for the next several hours as

21   the entire block was shut down, they could -- the

22   employees reported that he got there in shock.  He just

23   thought he had a near-death experience.  And, frankly,

24   he did.

25            He was terrified, understandably.  That was

1    the immediate impact of what the defendant did inside

2    that restaurant that day.  That's the immediate impact

3    of the defendant's crime.

4            And now Ms. Patel would present some victim

5    impact information that addresses a little bit more of

6    the long term.

7            THE COURT:  All right.  Ms. Patel?

8            MS. PATEL:  Thank you, Your Honor.  In

9    addition to some written --

10           THE COURT:  I'm going to have you speak right

11   in.  Thank you.

12           MS. PATEL:  Apologies.

13           THE COURT:  That's all right.

14           MS. PATEL:  In addition to some written victim

15   impact statements which I will share with the Court

16   briefly, there are some victims who are present in the

17   courtroom who would like to address Your Honor.

18           Out of respect to their privacy, the

19   government is not going to state their names but simply

20   refer to them as victims as they come forward.

21           THE COURT:  That's fine.

22           MS. PATEL:  Thank you.

23           THE COURT:  Good morning, sir.

24           VICTIM 1:  Hi.

25           THE COURT:  I'm going to have you speak right

1    into the microphone.

2              VICTIM 1:  Right into the microphone.

3              THE COURT:  Great.  Thank you.

4              VICTIM 1:  Your Honor, I would like for what I

5    say to not be considered in the sentencing.  That is out

6    of my hands.

7              As a victim, I have the right to speak and

8    this is -- after trying to be as sympathetic and

9    empathetic as possible with the defendant, this is how I

10   feel.

11             I'm almost sorry you were duped.  I'm almost

12   sorry that you fell into the trap of an orchestrated

13   game created by hateful people whose intention it is to

14   create fear and mistrust amongst the public.  I'm almost

15   sorry that the same people that inspired you to travel

16   from North Carolina and come to my place of work with an

17   assault rifle now believe you're a hired actor.  That's

18   how misinformation works and the game is played.

19             In my 32 years alive, I have never physically

20   hurt anyone, nor have I ever turned a blind eye to

21   anybody else's suffering.

22             Shame on you for assuming otherwise.  I hope

23   that the god that inspired all your tattoos is as

24   forgiving as I am.

25             As for those who instigate -- as for those who

1    abuse their First Amendment rights for financial or

2    political gain, I want you to realize that you almost

3    got blood on your hands.  I'm sorry I ever worried about

4    your children who have to spend time away from their

5    father.  Neither me nor any of my peers did anything to

6    deserve this.

7            Thank you.

8            THE COURT:  Thank you.

9            VICTIM 2:  Good morning, Your Honor.

10            THE COURT:  Good morning.

11            VICTIM 2:  I'm going to read my statement from

12    my phone.

13            THE COURT:  If you could do so loudly and

14    right into the microphone, that would be helpful.

15            VICTIM 2:  I will.

16            Okay.  What I've written, I can't get to

17    display.  So I guess I'll just talk.

18            So I've worked at Comet for six years.  I've

19    had that shift almost the entire time.  It's about the

20    entire time I've lived in D.C.  It's been my social

21    universe for much of that time or at least a big part of

22    it.  It's been my workplace.

23            My co-workers are my family, and not many of

24    them were able to come today because they don't want to

25    even see the defendant or have anything to do with this

1    any further.  So I hope I speak for them as well.

2         So that was the hardest day of my life up

3    until this point.  I've never been the victim of trauma

4    or serious fear before until that day.  I hope to never

5    experience those feelings again.

6         After the incident, for several weeks, I

7    couldn't sleep very well.  I couldn't go out.

8    Everything in the world was kind of just a reminder of

9    this moment, newspapers, people.  I was the center of

10   attention whenever I went to go hang out with friends

11   for months before this with the harassment.  And it was

12   all anyone wanted to talk to me about.

13        And then after this, I just wanted to sink

14   into the ground and not -- sorry.  I didn't -- I wasn't

15   able to leave my house.  I couldn't sleep.  I had

16   violent nightmares with all types of outcomes of the

17   situation replaying over and over and over again for

18   weeks.

19        And I don't like being the center of

20   attention, but I became one against my will.  I suffered

21   depression.  Me and many of my co-workers have had to go

22   to trauma counseling to deal with this situation.  And

23   lots of them are -- have been -- were in or are in maybe

24   worse shape than I am.  So that's why I'm here today.

25        All I want to say is I'm, like my co-worker,

1  Thomas, not comfortable offering a specific number for

2  punishment.  But I ask that any punishment that be given

3  out come with actual rehabilitation, full prisoner

4  rights and access -- real access to mental health

5  counseling if deemed necessary.

6        At this point in time, I feel more empathy for

7  you than anger.  I think that you need to move on with

8  your life, make restitution to your family that you so

9  cavalierly abandoned.  You deserve to work and have a

10  long life as full of happiness as possible.  And

11  you've -- we've all suffered plenty at this point.

12        And I just want to let you know that I hope

13  that you move forward in a positive direction and

14  realize that you have been a pawn of fractal and

15  misguided media of the criminal justice system, of

16  people that are happy to take advantage of you and are

17  eager to do so for financial or other gains.

18        I hope you realize that you are at fault for a

19  lot of suffering.  Perhaps you do realize that.  I hope

20  you do.  And I -- but I still wish you the best of luck

21  in your life moving forward.  I encourage you to

22  understand that actions ripple outward in unending ways.

23        And if the center of those actions and ripples

24  is coming from a place of positivity, that can make the

25  world better.  And I hope that you live your life in

1    that manner going forward.

2            And that's all I have to say.

3            And I'd like to thank Megan, the trauma

4    counselor who donated her time to the staff and her

5    community.  I'd like to thank all my co-workers who I

6    would do anything for.  And I hope I'm representing you

7    well here today.

8            I'd like to thank my girlfriend and parents

9    who were at home crying for eight hours straight because

10   they had no idea if I was alive or dead.  I'd like to

11   thank them for supporting me since that day.

12           I'd like to thank Jane, Siri, Bryce, all the

13   management of Comet Ping Pong for being flexible and

14   loving and doing whatever they could do to keep the

15   business running and help us continue to make a living.

16           I'd like to thank you for listening to me.

17   And that's all I have.  Thanks a lot.

18           THE COURT:  Thank you, sir.

19           Good morning.

20           MR. ALEFANTIS:  Good morning.  My name is

21   James Alefantis.  I'm the founder and owner and chef of

22   Comet Ping Pong in Washington, D.C.  And I'd like to

23   thank you for allowing me and my staff the opportunity

24   to speak at today's hearing.

25           Your Honor, thank you.  I do not envy your

1   position, and I am thankful that I have no role in

2   deciding justice in a case as terrible as this.

3        I will not enumerate the physical, emotional,

4   and economic harms that I experienced and have continued

5   to experience because of the events of December 4, 2016.

6   My written statement to the Court does that, as do the

7   statements submitted by members of my staff and of the

8   community.

9        I will say how brave my staff has been and how

10  proud and honored I am to work alongside each and every

11  one of them.  And I say that also being slammed with

12  this vicious web of lies that has been termed PizzaGate

13  has been immensely traumatic for me.

14       And I realize that this gunman's actions,

15  physically terrorizing a peaceful, loving community, was

16  by far the worst thing that had happened.  And it has

17  left lasting damage on many people I love.  So many of

18  us have suffered because of the defendant's actions.

19       For me, the only good thing that has come from

20  this ordeal is that I now know and understand that I am

21  a member of a community that comes together and raises

22  up any member who has fallen.  And I know that all the

23  families who experienced such pain by this one man's

24  decision will not allow their lives to be defined by

25  fear.

1          And I say this with no vengeance and with an

2   open heart.  I do hope that one day, in a more truthful

3   world, every single one of us will remember this day --

4   that day as an aberration, a symbol of a time of

5   sickness when some parts of our world went mad, when

6   news was fake and lies were seen as real and our social

7   fabric had frayed.

8          So as I stand before you today, I am hopeful.

9   I am hopeful that those who provoke fear, that traffic

10  in lies and perpetuate conspiracy will awake to the

11  tangible harms that result from their actions.  I am

12  hopeful that one day reason will prevail before a shot

13  rings out again in a place of warmth and love and

14  community gathering.

15         I am reassured that the friends and strangers

16  who we invite to our ping pong tables at Comet Ping Pong

17  and have for the past ten years will come together

18  stronger than ever before and see us for what we are, a

19  place for every peaceful person to come together and

20  break bread together.

21         Thank you, Your Honor.

22         THE COURT:  Thank you.

23         Ms. Patel?

24         MS. PATEL:  Thank you, Your Honor.  One of the

25  things that's most striking about this case, as is

evident from the statements Your Honor has heard already

and the ones that I will read for you shortly, is the

fear and anxiety that all of the victims have expressed

in their oral and written statements.

Mr. Welch's actions on December 4 have forever

changed the lives of these victims in the way that they

interact with their surroundings and with their

community.  His actions have indelibly seared that day

into their memory.

Time, the six months, seven months that have

passed since then, frankly, have not abated their fear

and their anxiety.  There's still security at Comet.

None of the employees feel safe without it.  They

question patrons who come in who they don't recognize or

who may look suspicious in some way, wondering if that

patron will be the next person to cause fear, trauma, or

anxiety in their lives.

This offense happened in their workplace, a

place that they have to return every day.  And the only

way they can avoid it is if they are to leave their jobs

that they so clearly love and the community that they've

formed at those jobs.

Many of them have expressed how they can't

escape what happened to them on December 4 because of

that very fact, because they do have to confront that

1    same place where the offense occurred every single day.

2         And so there are some other victims who have

3    submitted written statements here who did not feel

4    comfortable coming up to speak or could not be here.  I

5    won't read all of them, but I'm going to read selected

6    portions to the Court that the government believes

7    conveys what those victims are feeling now.

8         One victim who I'll refer to simply as

9    Victim 1, who was a manager on duty on December 4,

10   writes, and I quote, "I find myself often bursting into

11   tears.  I feel pure panic and terror some nights when

12   the memories flood back without warning; of slamming

13   fists on the expo window in order to alert the kitchen

14   that there was a gunman inside; of frantically waving

15   with my co-workers at customers to move toward the front

16   door to exit; of running to the firehouse as police cars

17   came speeding down the street; of calling the owner and

18   general manager to say a man with a gun walked into

19   Comet; of having to walk back inside the next day to

20   help figure out how we would reopen."

21        This person goes on to say, "I have obsessive

22   thoughts about how that afternoon could have gone

23   differently.  I have to be in the back room that the

24   defendant tore apart to investigate every single shift

25   and always think about what occurred there.

1    "I feel like I cannot escape those feelings

2    until I leave this job, which may have to happen soon in

3    order to maintain my sanity.  I should not have to leave

4    the job I love.

5    "I am angry that I have to write this

6    statement.  I am devastated that my friends have to

7    write statements too.  I wish there was never a need for

8    a statement like this.  I wish the defendant is

9    sentenced to the maximum prison time for his charges.  I

10    would feel a small sense of peace if the defendant was

11    offered psychiatric services."

12    Another victim who I'll refer to as Victim 2

13    writes, and I quote, "I'm not here to tip the scales.

14    I'm not hoping for a certain outcome.  I'm here because

15    my life changed after you came in.  The national

16    attention and hate that came with your poor choices was

17    deafening.

18    "As a manager, I now double as security at the

19    restaurant.  Everyone who works there has had to change

20    their settings on social media due to the thousands of

21    hateful comments they've had to delete."

22    This person goes on to write, "I've had shifts

23    interrupted with cops parked outside because someone

24    with a gun threatened us on Twitter and then was pinged

25    in Maryland after using his Go-Pass.  And, yes, the

1    restaurant has slowed down.

2         "So even though this has all happened already,

3    you still have the ability to create a great deal of

4    fear.  My hope is that you've learned your lesson.  I

5    hope I wouldn't see you on InfoWars with Alex Jones or

6    Twitter with Jack Posobiec or any other agitators.

7    We've been through enough.

8         "We've survived.  We just want to move on.

9    Out of respect for the damage you've already caused, we

10   hope that you do too."

11        A third victim writes, Your Honor, "Every

12   person in my life seems to have been negatively

13   affected, though each person has differing effects based

14   on their experiences.

15        "I was personally diagnosed with PTSD and

16   still receive trauma therapy to this day.  It's hard to

17   describe the feeling of an ever-present fear of someone

18   who may live hundreds of miles away targeting you with

19   the intent to murder you.  But I really don't fear that

20   fear is too outlandish based on the actions of Edgar

21   Welch."

22        This person then goes on to write, "I have

23   essentially suffered a total loss of narrative in my own

24   life.  Random strangers only want to know, Where were

25   you when the gunman came in?  My friends and family have

1   only recently, it feels, started to speak to me like I'm

2   a normal person and not some spectacle to gawk at.

3          "It certainly changes your worldview when

4   every single person in your life only wants to talk

5   about one thing, a horrible trauma that you just

6   suffered and just want to get over."

7          This person then goes on to write, "I want to

8   put in perspective that, though sentencing is probably

9   restricted by the fact that this is a 'bloodless crime,'

10   there's a lunacy at play here."

11          He writes that he and Mr. Welch are not all

12   that dissimilar in age or background but that the

13   difference between him and Mr. Welch is that, when he's

14   outraged at something, when he thinks that something is

15   wrong, he tries to create and build things that can make

16   the world a better place.

17          He goes on to write that when Edgar Welch

18   tried to destroy a community of people, the jobs that a

19   host of folks use to support themselves and their

20   families as well as -- and that when he tried to act as

21   an executioner for some imagined wrong with no authority

22   to do so, he would like to stand there in contrast.

23          He writes that, "Since this all happened, I

24   have been hugged, had my shoulder cried on, not had to

25   fire a single person, organized trauma therapy for

whoever needs it, supplied financial help to those
struggling with depression because of these events, told
that I was a hero by my friends and family.  And yet I
still feel like a damaged version of myself.

"I wish I could feel the words of what people
have told me, that I am a force of good and helped their
community regrow.  I don't feel it personally.  I don't
feel much of anything anymore.  Edgar Welch did that to
me."

In addition to these statements, Your Honor,
businesses in the community have noticed that they've
also had to increase their security as a result of these
actions because they are all located on the same block
as Comet and they worry and fear that someone could
commit some sort of copycat action at their business.

Your Honor, what the government would like to
note is that the employees of Comet, both the staff and
the managers, feel a deep sense of obligation to one
another.  And that is apparent through the statements
that they've given here in person and in writing.
They've built a community.  And what many of them have
mentioned in their comments, both in writing and in
person, is that they feel responsibility to each other,
that they feel responsibility to each other to help them
get over this horrible event that occurred in their

1    lives.

2           Their bond is strong enough that Mr. Welch

3    wasn't able to take that away from them, but they still

4    continue to feel the impact of his actions today and

5    possibly will for years to come.

6           The government would like to stress that this

7    was not a victimless crime.  And it was not a crime that

8    lacked in violence.  What the victims here are

9    struggling with is the fact that things could have ended

10   very differently on December 4.

11          It is to the credit of the staff at Comet that

12   they reacted with such unusual calmness when Mr. Welch

13   entered the restaurant and that they were able to get

14   the employees and the people inside of the restaurant

15   out of the restaurant safely and that there was no

16   confrontation between anyone in the restaurant and

17   Mr. Welch.

18          And that's why the fear that they feel still

19   persists, because they feel that things could have ended

20   differently, that the next time someone comes into their

21   restaurant maybe things won't go the way they did on

22   December 4.

23          Thank you, Your Honor.

24           THE COURT:  Thank you, Ms. Patel.

25           MR. AHN:  Your Honor, the government submits

1  that a four-and-a-half-year sentence in prison is both

2  necessary and appropriate in this case.  Interstate

3  transportation is not always a crime of violence.  It

4  applies to crimes where somebody has transported

5  firearms with intent to commit any felony without

6  reference to crimes of violence.

7         In this case, the intended violence was the

8  reason for the transportation.  It is the reason for the

9  charge and for the defendant's guilty plea.

10        We believe that that reason alone, in addition

11  to the other factors in this case, warrants a sentence

12  at the high end of the guidelines range for Count I.

13  And it is a similar analysis for Count II.

14        Assault with a dangerous weapon, the D.C. Code

15  crime covers a wide range of crime, many of which don't

16  involve guns, some of which involve a provocation or

17  even imperfect self-defense.  The defendant in this case

18  did have three guns.  He actually fired an assault

19  rifle.  And his impact had -- his assault had an impact

20  far beyond the average case.

21        He took this online harassment and threats

22  that was already in existence, and he made it real.  He

23  made it scarier.  He made it lasting in a way that had

24  an impact far beyond the typical assault with a

25  dangerous weapon case in this either court or in D.C.

1    Superior Court.

2          The defendant pointed out in its memorandum

3    two cases as examples that the defendant believed were

4    consistent with a lower-end sentence in this case,

5    *Oliveri* and *Dawson*.  In each of those cases, it was

6    essentially an attempted suicide by cop.  The person --

7    one of the people didn't even have an actual firearm.

8    He had an imitation gun which he pointed at a Capitol

9    Police officer.

10          In the other case, he was shot -- the

11   defendant was shot while pointing the gun at the ground

12   walking towards a Secret Service -- a uniformed Secret

13   Service officer asking effectively to be shot.

14          In both cases, those defendants had severe

15   mental illnesses.  Both were on anti-psychotic

16   medications.  One of them had been found legally insane

17   in a prior criminal case.  And both of them suffered

18   severe gunshot wounds.

19          I think that the defendant -- Oliveri was --

20   barely survived his gunshot wounds which he suffered

21   during the course of his event.

22          None of those factors -- which in the view of

23   the Court and courts in those cases warranted lower

24   sentences.  None of those factors are present here.

25   This case is nothing like those cases or, frankly, the

1    typical cases with assault with a dangerous weapon that

2    result in an average of three years in prison in D.C.

3    Superior Court.

4           This case stands out for all the reasons that

5    we've discussed.

6           Now, the defendant has, in a legal sense,

7    accepted responsibility.  And that's the primary reason

8    why, rather than asking for a sentence on the assault

9    with a dangerous weapon at the top of the guidelines,

10   it's six months below that.

11          The D.C. voluntary sentencing guidelines,

12   unlike the federal guidelines, don't incorporate

13   acceptance of responsibility into their calculations.

14   So by asking for a sentence six months below the high

15   end of the guidelines, we are -- we are accounting for

16   it there.

17          Importantly, though, the defendant hasn't

18   disavowed this ridiculous theory that motivated him.  He

19   has not apologized to the owner and the employees of

20   Comet itself.  In the words of one victim, he refused to

21   apologize to the staff or the owner.  And he has refused

22   to demonstrate any understanding of the trauma and

23   destruction he created.

24          And that particular victim is "eternally

25   fearful that Mr. Welch or someone just like him might

1    come back."  It is that real fear that this Court's

2    sentence must stress.  In this era of Internet rumors

3    and endless online incitement, the Court can't do

4    anything about that.

5              There's First Amendment protections for people

6    who speak online on all variety of topics.  But the

7    Court can address and its sentence must address

8    deterrence against similar people who would take that

9    online information, make it real, bring a gun into

10   somebody else's place of business or home, and threaten

11   or harm other people.

12             That type of vigilante conduct is what the

13   Court must deter.  And if you look at the facts of this

14   case, this defendant, he was not deterred by the risk of

15   death.  He seemed to openly actually contemplate it.

16             He was not deterred by the possibility of

17   prison.  He was not deterred by the impassioned appeals

18   from the love of his life.

19             This is the type of conduct that the Court's

20   sentence must deter, and we submit that a low-end

21   sentence is not enough for either just punishment or

22   deterrent.  We ask for four and a half years in prison

23   in total.

24             THE COURT:  Thank you, Mr. Ahn.

25             MS. JAHN:  Your Honor, could we take a

1    three-minute break?  I'd like to discuss something with

2    Mr. Welch that was part of the presentation.

3               THE COURT:  Yes.  Let's take a break.  Three

4    minutes.

5                    (Recess)

6               THE COURT:  Ms. Jahn, before you begin, you

7    may come.  But I just wanted to clarify something that

8    we looked up while we were in the break, which has to do

9    with the supervised release issue that we all talked

10   about.

11              I'm looking at the D.C. Statute 24-4031.  And

12   it appears that, "If the Court imposes a sentence of

13   more than one year, the Court shall impose a -- shall

14   impose a term of supervised release of" -- and then in

15   Subsection 2(b) -- "three years if the maximum term of

16   imprisonment authorized for the offense is more than one

17   year but less than 25 years."

18              So we think that this is the applicable

19   provision that -- under the D.C. Code assuming or if the

20   Court imposes more than one year, then we have a

21   three-year requirement for statutory -- I mean, a

22   supervised release.

23              MS. JAHN:  Very well, Your Honor.  As the

24   Court knows, I asked for a sentence of 18 months.

25              THE COURT:  Correct.

1          MS. JAHN:  So it exceeds what I had initially

2    highlighted with regard to what the probation officer

3    had suggested.

4          THE COURT:  Understood.  All right.  You may

5    begin with your presentation.

6          MS. JAHN:  Thank you, Your Honor.

7          First off, I would just like to highlight and

8    commend the three individuals that had the strength and

9    the courage to come forward today and speak on behalf of

10   their anxieties, fear, and, frankly, being terrorized

11   that day on December 4.

12         What was so remarkable in my mind about their

13   presentations was the level of humanity that they

14   displayed.  And that was a stark reminder to myself that

15   we are all humans, we all make mistakes, but we are more

16   than just the biggest mistake we've made on a particular

17   day.  Mr. Welch is more than just coming into that

18   restaurant with three guns, two of which were on his

19   person, and terrorizing those people.  It must have been

20   a frightening event.

21         But what are we all seeking here today?

22   Regardless of what side of the aisle or where we sit,

23   we're all seeking justice.  The defense submits we're

24   seeking justice for, frankly, just us.  Because that

25   poor restaurant has continued to receive harassing phone

calls, people showing up and doing foolish things.  It
is ongoing.

These vigilantes, the people that continue to
believe these conspiracy theorists, it's continuing.
And so I just wanted to remind everyone in this room,
including myself, that we are seeking justice for all of
us in here.  Because I submit that those are the most
important people that are involved in this case,
everyone in this room.

Now, while the government tries to pick apart
Mr. Welch's sincere regret and letter that he submitted
to Your Honor, obviously we have a different view of it.
Mr. Welch is extremely remorseful for the anxiety, the
trauma, the aftermath that occurred for everyone in that
restaurant, those that are here and those that are not
present in this courtroom.

Mr. Welch submits he did not think through how
it would come across to an employee working at the
pizzeria getting pizza and bringing it to patrons and
families who were there with small children.  Mr. Welch
was focused on -- while it is an outrageous and
outlandish sort of conspiracy theory, that's what he
believed.

He reviewed lots of outside media entities.
We obviously were given a snapshot from the government

1    about what he reviewed, but he has very strong beliefs

2    in caring for children.

3            Mr. Welch is a 29-year-old man from North

4    Carolina.  The town is called Salisbury.  Mr. Welch

5    refers to it as Smallsbury, no disrespect to the family

6    that's here.  It's a small town.

7            These are people who are not as sophisticated,

8    if you will, as others that reside here in the District

9    of Columbia who are aware of politics, wrong information

10   put on the Internet.  Mr. Welch is not that person.

11           There's lots of commentary and also statements

12   in the victims' letters that Mr. Welch should have

13   stepped on a platform to reach out to the people that

14   submitted these false stories online or send a message

15   as a platform to stop this fake news.  Mr. Welch, while

16   he may be wanting to do that, he is from Smallsbury,

17   North Carolina.  And what he stands before the Court and

18   wants to say is that he is extremely remorseful for his

19   conduct in this case, and it is sincere and it is

20   significant.

21           From the time of Mr. Welch's arrest, his story

22   has never changed.  He admitted candidly where he set

23   down the two firearms, why he set them down in the

24   various locations in which he did, why he took off

25   certain articles of clothing.

1          He cooperated at every step upon learning that

2    there was no hidden door, there's no children being

3    harmed here.  What was so unique in this case is that

4    Mr. Welch's story and remorse for coming in with these

5    firearms was unwavering.

6          He has accepted responsibility for what he's

7    done.  And we submit he should be judged for more than

8    just this isolated, awful, and terrorizing event.

9    Mr. Welch has lived a life being committed wanting to

10   help others.  It is not a manufactured sense of

11   character in anticipation of this hearing.

12          His family has lived a life of commitment back

13   to the community.  His entire family is here and present

14   in the courtroom.  I would like to ask each of them to

15   stand when I mention their name.  They are in the front

16   row to the Court's right.

17          We have his mother, Terry Lee Welch.  We have

18   his father, Harry Lee Welch, Junior.  We have his

19   sister, Blair Welch Young.  We have his fiance, Miranda

20   Lee Reid, also known as "the girlfriend" in the

21   government's presentation.  We also have very close

22   family friends, and I'll ask all three to stand at the

23   same time:  Christine Nesbit; their son, Noah; and Steve

24   Nesbit.

25          These are people that, while their trauma is

1    very, very different than any of the trauma that

2    occurred at that pizzeria, they too have been

3    traumatized in their own way by their son, their family,

4    their friend's actions.

5           Mr. Welch, as the Court knows, at a very young

6    age began serving his community and giving back to those

7    in need.  From the age of 21, he became a licensed EMT,

8    emergency medical technician.  He loved the job.

9           And when the earthquake in 2010 struck Haiti,

10   Mr. Welch learned of a mission trip sponsored by his

11   church, and he eagerly signed up and spent three

12   grueling weeks in that decimated country.  I don't need

13   to remind everybody about the conditions there and the

14   plight of many -- frankly, tens of thousands of children

15   that were left without parents.  There was devastation

16   across that country.  Mr. Welch was extraordinary in

17   helping, providing EMT services, assisting with the

18   children.

19          The Court has a letter from Pastor Flurry, who

20   then supervised Mr. Welch while he was there in Haiti,

21   discussing his extraordinary efforts at that time and,

22   frankly, some of the concerns they had about Mr. Welch

23   and his own well-being for the sake of helping children.

24          That occurred in 2010, over six years prior to

25   the offense conduct in this case.  I mention it and

1    highlight it because it demonstrates, from Mr. Welch's

2    perspective, his commitment and eagerness to want to

3    help children, which is what ultimately landed him in

4    the situation that we're in now.

5            After Mr. Welch returned from Haiti, he became

6    a dad and a husband in early 2011.  He then had his own

7    daughter in 2013.  As the letters attached to my

8    sentencing memorandum exhibit, he is an extremely,

9    extremely devoted father.  He has been there every step

10   of the way.  He, in essence, had custody of the children

11   full time.  There had not been something worked out, but

12   everybody who knows the situation at the time up to 2016

13   knows that Mr. Welch was responsible for the girls.

14           He was always concerned about the proper care

15   for children.  And these two girls, his daughters, were

16   his lifeline.

17           And how the government characterizes it is for

18   their lens of how they seek justice, but I submit that

19   Mr. Welch not being able to communicate with his two

20   daughters has been an extraordinary consequence for his

21   actions.  This is a man who saw his children every day.

22           I'm a parent.  I can't imagine not speaking to

23   my child for a day, let alone six months, and having no

24   ability to change the situation.  It is a huge

25   collateral consequence to his actions in this case that,

1    frankly, can't be measured.

2            Secondly, when Mr. Welch was first arrested in

3    this case, because of his actions and the notoriety and

4    the extreme public scrutiny of what was going on in

5    terms of press reports and the like, Mr. Welch was

6    placed in solitary confinement at the D.C. jail.

7            In my papers to Your Honor, I submitted that

8    he had been in solitary for five weeks.  At the time I

9    submitted my sentencing memorandum, I did not have the

10   institutional file records that I have now.  And they

11   reflect that he actually was in solitary confinement for

12   just shy of eight weeks, almost two months.

13           Now, the government makes light of that

14   experience of solitary confinement and say that, well,

15   now he's been able to then be in general population and

16   that alone -- that experience alone of solitary

17   confinement shouldn't be considered.

18           Well, we just have a different view.  Someone

19   who has never been incarcerated, let alone detained, let

20   alone taken away from family members, whether it's

21   through their own actions -- which, of course, in this

22   case, it is his own actions.  But to then be placed in

23   solitary confinement which, in essence, is 24 hours a

24   day, locked down, no interaction with a person, it's an

25   extraordinary confinement setting and it's something

1     that the Court can consider in fashioning a sentence.

2     The D.C. jail's conditions of solitary confinement

3     surely can be considered by this Court.

4          Now, as I said, we're all seeking justice in

5     this case.  And what does that require us to look at?

6     Punishment.

7          Well, here we're asking for a low-end

8     guideline compliant sentence.  It is a significant

9     punishment.  As the Court knows, for anyone who is a

10    first-time offender who has never served any period of

11    incarceration, their first period of incarceration is a

12    very strong punishment.  Eighteen months in this case is

13    strong, 18 months away from his family, 18 months where

14    he has no ability to converse with his children.

15         In addition, he's now been stamped as a

16    convicted felon.  And, importantly, he no longer has the

17    ability to possess any firearm.  I hope that causes some

18    comfort for the victims who are here in court today.  He

19    will have no ability to ever possess a firearm again in

20    the future.  That is a significant punishment and a

21    significant consequence to his actions and rightfully

22    so.

23         Now, deterrence.  We submit that Mr. Welch has

24    been individually deterred.  But as the government

25    characterizes it, these would-be vigilantes, they need

1  to be deterred.  And I would submit, sure, vigilantes

2  need to be deterred.

3           What we all need to talk about is this

4  elephant in the room.  And the elephant in the room are

5  these false stories, information that gets said on the

6  Internet by people -- not Mr. Welch.  They're not here

7  in this courtroom.  While the victims and the government

8  may feel that those people need to be punished -- and

9  maybe they will -- those people are not standing before

10  Your Honor today.  Mr. Welch is.

11           And as I've cited, unfortunately, there are a

12  whole group of communities that still believe in this

13  false conspiracy theory directed at the various persons

14  we've heard from in the government's presentation.

15  There's nothing that we can do to stop that.

16           The government also cited a case from

17  Louisiana where a man had called in making continuing

18  threatening remarks shortly thereafter Mr. Welch's

19  conduct occurred in December.  What they didn't tell you

20  was that man only received a jail sentence of one month

21  incarceration.  What type of message does that send?

22           Here in this case, Mr. Welch is admitting his

23  conduct and asking for a guideline-compliant sentence.

24  He could have chosen to ask for a lower sentence, but we

25  believe the low end of the guidelines was appropriate.

1          How else do we need to seek justice in this

2    case?  We need to protect the public.  An 18-month

3    sentence of incarceration does confine him away from the

4    public for 18 months.  Then he will be on supervised

5    release for at least three years.  We've had a

6    conversation about the term, but at least three.

7          He will no longer be in this community.  He

8    resides in North Carolina.  We would even agree to

9    having a restriction in travel up to the District of

10   Columbia or at best a stay-away from the pizzeria or the

11   location along that -- various businesses along that

12   road on Connecticut Avenue.

13          How else are we protecting the public?

14   Mr. Welch would no longer have access to firearms.  He's

15   precluded for the rest of his life from ever possessing

16   a firearm.  That would protect the public from any

17   further conduct like the conduct he stands before

18   Your Honor.

19          And finally, disparity in sentencing.  As the

20   Court knows, every single case is different.  I tried my

21   best to find a case that involved firearms, the use of a

22   firearm, and law enforcement.  Because that's what we

23   have here.  And I cited the two cases because those are

24   the only two that have been charged and tried in

25   District Court that have some similar conduct.  I am not

1   trying to say they are the exact same conduct in this

2   case.

3          But what's different about Mr. Welch is -- and

4   I just want to step back for a moment -- is that when he

5   entered, completely carrying the AR that we've seen

6   here, it must have been terrifying to everyone to see

7   it.  He didn't use the AR on the door when he first

8   tried to open it.  He used a butter knife.  And as the

9   Court will recall from the government's presentation,

10  there was a screen, if you will, that was next to the

11  closet.  And it's where they will also do rolling of

12  napkins and different utensils.  The butter knife he

13  grabbed from there to try to use to undo the lock.

14         What then the government doesn't know, because

15  Mr. Welch is the only person who was in there at the

16  time, was that he jumped up to look over top because you

17  can actually see in.  I went there.  I saw it.  And he

18  looked in and saw it was a computer.  So he knew there

19  wasn't anyone behind there.  So he jumped back down and

20  then fired at the lock.

21         It's not to excuse the behavior.  It's just to

22  provide context.  Because Mr. Welch didn't come in there

23  trying to use the firearm immediately to a door that

24  appeared to be locked.

25         Was it reckless?  Was it terrifying?  Was it

1    illegal?  Was it criminal?  Yes.  He should have never

2    unloaded that firearm.  But he did so.  It didn't even

3    open because there's a lock at the top.  There were two

4    locks.  Now it's a different set of locks because

5    everything was replaced, but it looked different at the

6    time.

7         Once Mr. Welch realized that there was nothing

8    there, no children being held against their will, he

9    laid his firearms down in two separate locations on

10   purpose.  He took off his sweatshirt on purpose and

11   exited with arms out of the restaurant and followed

12   every command of law enforcement.

13        Your Honor, this has been a very difficult

14   case for everyone, most notably the victims.  But,

15   Your Honor, this case is unique.  And what is unique

16   about it is that we resolved it relatively quickly.

17        Mr. Welch has expressed sincere and extreme

18   remorse for his behavior.  He is being punished in ways

19   that I cannot fully articulate here.  His family has

20   their own repercussions.  But Mr. Welch there -- went

21   there to defend children.

22        As -- the government highlighted a text

23   message.  Mr. Welch was saying, "I'm defending the next

24   generation of kids, our kids."  That was his motive,

25   Your Honor.  And he has lived a life devoted to helping

1     kids.  In this way, it was an absolutely reckless,

2     misguided, illegal approach to try to defend children.

3     And he recognizes that.

4              Given all of the circumstances of this case,

5     Your Honor, and the factors of Mr. Welch and his

6     background, we submit that a low-end guideline-compliant

7     sentence is appropriate.

8              THE COURT:  Thank you, Ms. Jahn.

9              Mr. Welch, if you have something that you

10    would like to say to the Court regarding sentencing, now

11    would be the time.

12             THE DEFENDANT:  Your Honor, I wish there's

13    more I could offer other than an apology.  I realize

14    that words cannot undo or change what's already

15    happened.  But I am sorry.

16             And just to make sure the victims understand,

17    that goes for everybody involved, the staff included.  I

18    am deeply sorry for anything I've caused.  Thank you.

19             THE COURT:  Thank you, Mr. Welch.

20             MS. JAHN:  Do you want him to remain at the

21    podium, Your Honor?

22             THE COURT:  No.  He's welcome to sit.

23             So one thing Ms. Jahn says resonates with me,

24    which is this is a difficult case.  The Court will

25    follow and has followed its ordinary process of

calculating the sentencing guidelines, hearing the statements made by counsel -- both government counsel, defense counsel -- hearing the statements made by the defendant, reviewing the record in this matter.

And it must now consider the relevant factors that were set out by Congress in 18 U.S.C. 3553(a) in order to ensure that it imposes a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing.

These purposes include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.  The sentence must also deter criminal conduct, protect the public from future crimes by a defendant, and promote rehabilitation.

In addition to the guidelines and policy statements, the Court must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the types of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.

The D.C. Code requires the consideration of similar factors.  It requires the Court to impose a

1    sentence that reflects the seriousness of the offense

2    and the criminal history of the offender; provides for

3    just punishment and affords adequate deterrence to

4    potential criminal conduct of the offender and others;

5    and provides the offender with needed educational,

6    vocational training, medical care, or other correctional

7    treatment.

8            This Court has considered all of these factors

9    when deciding what the appropriate sentence is in this

10   case.  And in accordance with my ordinary practice, I

11   won't proceed to detail each of my considerations with

12   respect to each of the factors orally here today.

13           I do, however, want to provide remarks for the

14   record and for you, Mr. Welch, about my considerations

15   with respect to the nature and circumstances of this

16   offense, your history and characteristics as an

17   offender, and the need to avoid unwarranted sentencing

18   disparities.

19           First, with respect to the nature of the

20   offense, you have acknowledged and your counsel has as

21   well that the conduct at issue here is extremely

22   serious.  I want you to know in addition that it really

23   is relatively unusual to have crimes that involve actual

24   violence and actual victims prosecuted in federal court.

25           Ordinarily, I'm considering crimes that

1    involve significant risks of harm, things like the

2    distribution of significant amounts of drugs or the

3    possession of a weapon by a person who was previously

4    convicted of a felony.  And Congress has prescribed

5    significant penalties for those serious offenses and no

6    actual violence necessarily need occur.

7            So when I'm thinking about the nature of the

8    conduct at issue here, I have to ask, how much more

9    serious is this behavior?  Your conduct involved not

10   only the risk that people might be harmed but actual

11   damage to the lives of real people.

12           It's common for courts in my position in

13   federal court to recognize along with the parties that

14   there are "no discernible victims" in a case.  But

15   that's not the case here.  And what we've heard today

16   from the brave people who spoke, from the many people

17   who wrote letters to the Court about the impact of this

18   crime on their lives underscores even better than I can

19   what this has meant to them and how it has damaged this

20   community.

21           I want to point out one particular person and

22   set of comments.  The owner of the restaurant, who spoke

23   here today, in his comments at the podium talked about

24   his optimism and the strength of the community that has

25   formed both before and in the wake of this event.

1          I appreciated his oral statement, but I was

2     also struck by the written words that he put forward

3     about the emotional and financial impact of these

4     offenses on him personally.

5          In one particularly poignant paragraph, he

6     says, "At this point, I can't open another restaurant.

7     I can barely use my name publicly.  I can't get another

8     job, and I certainly have no discretionary funds to

9     pursue my passions in life beyond running my business

10    and keeping myself safe.  In this sense, my

11    constitutionally protected liberties have been severely

12    curtailed."

13          Mr. Welch, I hope you understand and see how

14    much people are suffering as a result of what you did.

15    And I also hope that you take away from this, in

16    addition to these heart-wrenching stories about the

17    impact, the fact that this really doesn't happen every

18    day in my courtroom or even in this courthouse.

19          And I think it's fair to say that your

20    criminal conduct has literally left psychological

21    wreckage in its wake.  That is something that this Court

22    has to take very seriously as I evaluate the appropriate

23    sentence in this case.

24          Now, I do understand your counsel's very

25    vigorous, passionate and repeated contention that you

1   acted with good intentions.  Ms. Jahn emphasizes that

2   you have a heart for children and that what you did in

3   this case was out of genuine concern for them.

4           In your letter to the Court, you echo these

5   representations by saying that you carried the weapons

6   and entered the restaurant "with the intent of helping

7   people I believed were in dire need of assistance."  And

8   I have no reason to doubt this assertion.  I do believe

9   you.

10          I believe that you thought that you were being

11  helpful in doing the right thing.  You weren't some

12  robber who burst into the restaurant looking for money

13  or trying to benefit yourself personally.  I know that,

14  and I've taken that into account.

15          But the problem is that, in our society, no

16  matter how well intentioned, people are not permitted to

17  take matters into their own hands.  Acting violently

18  even for good causes is not okay.

19          As the government emphasizes, we actually have

20  a system for dealing with concerns such as yours.  And

21  people are not encouraged to do these sorts of things on

22  their own.

23          If you truly believed that children were being

24  harmed, as a concerned citizen, it was incumbent upon

25  you to notify law enforcement authorities.  That is why

1    we have law enforcement authorities.  It's their job to

2    investigate and to act upon these kinds of issues, not

3    yours.

4         And for present purposes, the fact that you

5    took it upon yourself to act out in this violent way and

6    especially the fact that you did this in relation to a

7    matter of significant public issue -- public interest

8    raises another issue of serious concern that the

9    government has highlighted and that I cannot overstate,

10   which is that other people will see what you have done

11   and be inspired by it.

12        The fear is now that, even though no one was

13   physically harmed in this case, other people who are

14   worried about other issues will take up arms with the

15   intent of sacrificing lives in order to achieve what

16   they believe is a just result.  And as I'm sure you

17   know, that kind of system of justice is utterly

18   incompatible with our constitutional scheme and with the

19   rule of law.

20        By the way, that's why the government has said

21   repeatedly in its papers that your assault was an

22   assault on the rule of law and not just the people in

23   the restaurant and in this community.

24        And what that means for this Court is that it

25   needs to impose a sentence that deters similar potential

1   future conduct.  That risk now looms large and is

2   substantial in the context of this case.

3          On the subject of the need for specific

4   deterrence, you heard Ms. Jahn talk about the fact that

5   she believes you have been deterred.  But the Court

6   notes, as the government points out, that this

7   particular decision was not an off-the-cuff decision

8   that you made.  It was not impulsive, heat of the

9   moment.  It wasn't that kind of determination.

10         You may have been driven do this because of

11  your passion for children, but you thought it through

12  enough to develop a plan several days before the

13  incident.  You tried to recruit others to help you with

14  it.  And there were several opportunities for you to

15  abandon this ill-conceived plot.  In fact, several

16  people told you to do that.  But you forged ahead.

17         And your clear persistence in pursuing such a

18  misguided venture, even when your friends and loved ones

19  urged you not to do anything stupid related to these

20  concerns, makes this Court worry about your state of

21  mind with respect to all of this and whether it has

22  really changed.  What I mean by that is that, although

23  you now apologize and say that you realize that this was

24  a mistake, what I'm trying to figure out is whether

25  you've come to that realization only because you weren't

1    able to achieve the ends that you set out to achieve on

2    this particular mission.

3            This is a subtle and nuanced point, but I

4    think it's important.  I'm trying to figure out whether

5    the mistake, in your mind, was that you did all of this

6    for naught, because in this instance there weren't

7    really any children to save or whether this was a

8    mistake to you because you now understand that you went

9    about the righteous goal of saving children in a totally

10   inappropriate, dangerous, and illegal way.

11           This matters because if it's the former, if

12   the thing that's wrong was that there was no children

13   there, then the Court really has to worry that some day

14   you might find another worthy cause, one that's a real

15   concern and not the product of the Internet, and take

16   action once again.  That, of course, would be

17   unacceptable.

18           And so the sentence that this Court imposes

19   today also has to take into account any lingering need

20   for specific deterrence in order to address and

21   hopefully eliminate any possibility that you are still

22   willing to risk lives, yours and other people's, for a

23   noble cause in this way.

24           Let me say something about your

25   characteristics as an offender.  The Court has taken

1    into account that you have a very minimal criminal

2    history, and that is a significant mitigator.  It's also

3    one that the federal guideline system takes into

4    account.

5           Mr. Ahn explained that the D.C. guidelines

6    don't take into account things like acceptance of

7    responsibility, but both sets of guidelines look at

8    criminal history.  If you had done the same thing that

9    brings us here today but you also had a string of prior

10   crimes in your past, you'd be looking at a much larger,

11   longer guideline than what is being considered before

12   the Court now.  So the fact of your minimal criminal

13   history is already accounted for.

14          The Court has also considered seriously the

15   many letters and comments from people who know you

16   personally.  I appreciate the fact that Ms. Jahn

17   introduced members of your family.  I'm happy that

18   they're here.  Not every defendant has family support,

19   and so you're very lucky in that regard.

20          And I always appreciate getting letters from

21   family members and friends of a defendant because they

22   often tell me who that defendant really is.  And that's

23   important.  I agree with Ms. Jahn that people are not

24   the sum total of the worst thing they've ever done.

25          The letters and statements here uniformly

1   attest to your personal goodness and kindness, your

2   concern for the well-being of children, the substantial

3   charitable works that you've done, the sacrifices that

4   you've made for other people, the fact that you're a

5   terrific father, and your spiritualty.

6           I've taken account of all of this.  And please

7   know that I do not doubt for one second that you are

8   generally a good person and of good moral character.

9   And I applaud you for that.

10          But as I'm sure you know and can understand,

11  good people sometimes make bad choices and do bad

12  things.  And our criminal justice system not only looks

13  at a person's history and background and general

14  character but also the need for the sentence imposed to

15  reflect respect for the law and just punishment for the

16  offense that has been committed.

17          These considerations weigh heavily against

18  giving you too much credit for your prior good works.  I

19  accept them.  I know them to be true.  But yet and still

20  we have this very serious criminal behavior that caused

21  real damage, and that cannot be overlooked or swept

22  aside.

23          I do want to say one more thing with respect

24  to one aspect of your character.  This came out a lot in

25  the letters, the fact that you are, by all accounts, a

1    very capable and loving father of two young children.  I

2    see that a lot.  I have a number of defendants who are

3    parents and who are concerned, rightly so, about the

4    impact of their criminal behavior and incarceration on

5    their children.

6              This is a very important consideration.  It's

7    something that the Court thinks about.  But as I often

8    tell parents who come before me, really the most

9    important moment to focus on the needs and well-being of

10   your children is the moment before you undertake to

11   commit a crime.

12             And if the concern about the impact of your

13   behavior on your own children was not enough to stop you

14   from committing the crime, why should it be sufficient

15   to shield any parent from the consequences of their

16   behavior?  If anything, it seems to me the opposite is

17   true.

18             I think that we, as a society, teach our

19   children something important when we demonstrate clearly

20   that choices have consequences and that defendants who

21   have children have the opportunity to underscore this

22   important lesson by taking full responsibility for their

23   crimes.

24             As I mentioned at the outset, in addition to

25   the nature and circumstances of the offense and the

1     history and characteristics of the offender, this Court

2     is also required to consider a variety of other factors,

3     including the need to avoid unwarranted sentencing

4     disparities.  This factor is often important in my

5     consideration of how to sentence a defendant.

6          Your counsel and government counsel both spoke

7     to this in their papers and today at sentencing, and I

8     think it's important for me to take a moment to address

9     it.

10         Defense counsel has offered two cases.  She

11    explained today that she did the best she could under

12    these circumstances.  But it appears she agrees that

13    those cases aren't entirely on point and that this case

14    is, in many ways, unique.

15         Defense counsel also points to statistics from

16    the annual reports regarding the D.C. voluntary

17    guidelines charge.  And data can sometimes be helpful.

18         Counsel specifically notes that the average

19    sentence for all offenders who are in the same offense

20    group that you are under those guidelines is

21    37.1 months.  And she argues that the government's

22    request -- their request in this case far exceeds that

23    average.  That's certainly true.

24         But in the Court's view, yours is not an

25    average case.  I can't say for certain what the facts of

1   the other assault cases under D.C. law look like, but I

2   must say that I've never heard anything like the conduct

3   that brings us here today.

4          You carried a dangerous assault rifle and

5   other weapons across state lines in order to come here

6   and confront people you did not know on the basis of an

7   Internet rumor.  Your friends tried to stop you, but you

8   did it anyway.

9          And while you may have intended to save

10  children, you clearly expected a violent confrontation

11  and you actually discharged your weapon in the course of

12  this event.

13         The extent of the recklessness in this case is

14  breathtaking.  And it was sheer luck that no one was

15  physically injured or killed, including you.  And if

16  that had happened, this case probably, to the extent

17  you'd have survived, would have been charged in a

18  totally different fashion.  And it certainly would not

19  have been grouped with other mere assaults.

20         The bottom line is that this is no ordinary

21  assault case.  There is no precedent for this.  And as

22  far as I can tell, this kind of thing has never happened

23  before.  This Court has a duty to impose a sentence that

24  protects the people of this community by ensuring that

25  this kind of thing never happens again.

1              I'm truly very sorry that you find yourself in

2    this position because you do seem like a nice person

3    who, in your mind, was trying to do the right thing.

4    Unfortunately, those good intentions are not enough to

5    excuse your reckless behavior and the damage, the real

6    damage that it caused.

7              In light of all of the 3553(a) factors and

8    also taking into account the fact that the maximum of

9    the applicable range under the D.C. voluntary guidelines

10   is 60 months while the average sentence for a person

11   faced with similar charges is 37 months, this Court

12   believes that a period at the high end of the federal

13   guidelines range, 24 months of imprisonment on Count I

14   and a sentence of 48 months of imprisonment on Count II

15   to run concurrently, is sufficient but not greater than

16   necessary to reflect the seriousness of the instant

17   offenses; to promote both specific and general

18   deterrence; to protect the public from future crimes

19   that may be committed by this defendant and others; and

20   to avoid unwarranted disparities among defendants

21   convicted of similar crimes.

22             Therefore, based on my consideration of all of

23   the relevant factors, I will now state the sentence to

24   be imposed.

25             Mr. Welch, please stand.

80

1          It is the judgment of the Court that you,

2   Edgar Maddison Welch, are hereby committed to the

3   custody of the Bureau of Prisons for a term of 24 months

4   on Count I and 48 months on Count II to run concurrently

5   for a total of 48 months of imprisonment with credit for

6   time already served since your detention on the charges

7   in this case.

8          You are further sentenced to serve a term of

9   36 months of supervised release on Count I and 36 months

10  of supervised release on Count II to run concurrently

11  and to pay a special assessment totaling $200 and

12  restitution in the amount of $5,744.33, which this Court

13  finds reflects the approximate value of the physical

14  damage to the restaurant's property.

15         The Court finds that you do not have the

16  ability to pay a fine and, therefore, waives the

17  imposition of a fine in this case.

18         The special assessment totaling $200 for

19  Count -- excuse me.  A special assessment totaling $100

20  for Count I is immediately payable to the Clerk of the

21  Court for the U.S. District Court of the District of

22  Columbia.

23         Within 30 days of any change of address, you

24  shall notify the Clerk of Court of the change until such

25  time as that financial obligation is paid in full.  The

1  Court waives any interest or penalties that may accrue

2  on unpaid balances.

3          The special assessment of $100 for Count II is

4  immediately payable to the Budget and Finance Office of

5  D.C. Courts, 16 H Street NW, Suite 600, Washington, D.C.

6  20001.

7          Restitution payments shall be made to the

8  Clerk of the Court for the United States District Court

9  for the District of Columbia for disbursement to the

10  victim as follows:

11          Mr. James Alefantis and Big Bucks, LLC, d/b/a,

12  Bucks Fishing and Business, 5037 Connecticut Avenue,

13  Washington, D.C. 20008, in the amount of $5,744.33.

14          The Court will also recommend to BOP that you

15  be considered eligible for educational and vocational

16  programs while you are incarcerated.

17          Within 72 hours of release from custody, you

18  shall report in person to the probation office in the

19  district to which you are released.  While on

20  supervision, you shall submit to the collection of DNA.

21  You shall not possess a firearm or other dangerous

22  weapon.  You shall not use or possess an illegal

23  controlled substance.  And you shall not commit another

24  federal, state, or local crime.

25          You shall also abide by the general conditions

1    of supervision adopted by the U.S. Probation Office as

2    well as the following special conditions which I will

3    state and then describe the reasons for as the

4    D.C. Circuit requires.

5              Restitution:  You shall pay the balance of any

6    restitution owed at a rate of no less than $50 a month

7    and provide verification of same to the probation

8    office.  This obligation is the least restrictive means

9    possible of ensuring that restitution is provided to the

10   victims of the offenses for which you have been

11   convicted.

12             Financial disclosure:  You shall provide the

13   probation office with your income tax returns,

14   authorization for release of credit information, and

15   information about any business or finances in which you

16   have a controlling interest until all restitution is

17   satisfied.

18             Like your restitution obligation, this

19   condition is the least restrictive means of ensuring

20   that restitution is provided to the victims of the

21   offenses for which you have been convicted.

22             Location restriction:  You are prohibited from

23   approaching or entering the Comet Ping Pong restaurant

24   during your term of supervision.  Imposing this

25   condition is the least restrictive means of protecting

1       the community and yourself from further potential harm

2       related to your offenses.

3               Mental health assessment:  You shall submit to

4       a mental health assessment and, if necessary,

5       participate in a mental health treatment program which

6       may include outpatient counseling or residential

7       placement as approved and directed by the probation

8       office.  If medications are prescribed by a psychiatrist

9       or physician, you shall take all medications as

10      prescribed and shall not discontinue any medication

11      without permission of the Court.

12              Given the clear connection between good mental

13      health and the crimes for which you have been convicted,

14      this condition is the least restrictive means possible

15      of protecting the public from future offenses, deterring

16      you from committing any future offenses, and ensuring

17      that you remain in good mental health in the name of

18      rehabilitation.

19              Pursuant to the terms of your plea agreement,

20      you are ordered to forfeit the firearms and ammunition

21      outlined in paragraph 11 of the plea agreement.  The

22      probation office shall release the presentence

23      investigation report to all appropriate agencies in

24      order to execute the sentence of this Court.

25              Mr. Welch, you have the right to appeal the

1    sentence imposed by this Court under the limited

2    circumstances laid out in your plea agreement.  If you

3    choose to appeal, you must file an appeal within 14 days

4    after the Court enters judgment.  If you're unable to

5    afford the cost of an appeal, you may request permission

6    from the Court to file an appeal without cost to you.

7         Let me ask counsel if there are any objections

8    to the sentence imposed that are not already noted on

9    the record.

10        MR. AHN:  No, Your Honor.

11        MS. JAHN:  Yes, Your Honor.

12        Your Honor, with regard to the specific

13   conditions with regard to supervised release outlined

14   with regard to mental health assessment involving all

15   the way through the language about medication, there is

16   no basis in the record for mental health medication

17   compliance.  There's nothing in the presentence report,

18   nothing submitted to this Court that would warrant such

19   a strict condition.

20        THE COURT:  So tell me what you mean.  Are you

21   talking specifically about the language relating to

22   medication compliance, or are you saying there's no

23   basis for mental health assessment?

24        MS. JAHN:  Both, Your Honor.  I think the most

25   restrictive terms that the Court articulated -- I don't

1   have them.  I was trying to write it down as quickly as

2   I could.

3           THE COURT:  Yes.

4           MS. JAHN:  Related to the medicine, there is

5   nothing in the record to suggest that that would be an

6   appropriate term or restriction or condition of

7   supervised release.  That, to me, was the most

8   restrictive.

9           It then in federal format went to just

10  generally a mental health assessment as directed by the

11  probation department.  I don't think generally we

12  have -- there's no objection to an assessment by

13  probation in 48 months from now.  But the other terms

14  that the Court articulated, there's no basis in the

15  record.

16          THE COURT:  All right.  Well, the Court heard

17  several people, including many of the victims, talk

18  about the need, in their view, for some mental health

19  assessment.

20          Also Mr. Welch pled guilty to a crime

21  involving guns, weapons, traveling in interstate, coming

22  to a restaurant in this way on the basis of something he

23  read on the Internet.

24          MS. JAHN:  I understand, Your Honor.

25          THE COURT:  I understand that the defense's

1    position is that there's no basis, apparently, for him

2    to be evaluated with regard to mental health treatment.

3              But let me ask the government whether they

4    believe that this condition is offensive, and we'll talk

5    about the medications in a second.

6              The way that the Court articulated the

7    criteria were -- was you shall submit to a mental health

8    assessment and, if necessary, participate in a mental

9    health treatment program, which may include outpatient

10   counseling or residential placement as approved and

11   directed by the probation office.

12             This is a standard condition that is sometimes

13   imposed where the record indicates that there may be a

14   need for the defendant to receive treatment related to

15   potential conduct -- criminal conduct that appears to

16   involve mental status.

17             So let me ask you first whether you are

18   objecting to the assessment and, if necessary,

19   participation in health treatment.

20             MS. JAHN:  Yes, Your Honor.  I object to all

21   of it.

22             THE COURT:  All right.

23             MS. JAHN:  If I could be heard.  The Court

24   indicated that the victims mentioned some reference to

25   their assessment that Mr. Welch is in need of mental

1  health.  I'm not trying to take any issue with their

2  sentiments or their beliefs.

3         What we have to look at, though, are the

4  actors in the case in terms of the lawyers and the

5  probation department and the information provided to

6  Your Honor, who are all well versed in the details of

7  the case.

8         While the victims may have a different

9  perspective, there is nothing in the record to suggest

10 that Mr. Welch is in need of mental health treatment.

11 And while the conduct is egregious and the Court has

12 already made its statements about its assessment of the

13 conduct and imposed incarceration, that in and of itself

14 does not warrant mental health assessment when there is

15 nothing in the record to support it.

16        And importantly, Your Honor, the Court knows

17 there is a preclusion in the plea agreement, standard

18 language from the U.S. Attorney's Office that precludes

19 any challenges on appeal to particular conditions of

20 supervised release.  And given the record that we have,

21 we believe that there's nothing in the record to support

22 this Court's --

23        THE COURT:  All right.  Let me ask you about

24 paragraph -- before you leave the podium --

25        MS. JAHN:  Yes.

1              THE COURT:  Paragraph 75 of the PSR, which

2     states that Defendant Welch, while he was employed at a

3     particular food distribution facility in 2016, which was

4     just last year, accidentally struck someone, which I

5     understand from further parts of the PSR -- and this was

6     a young teen -- resulted in a fatality --

7              MS. JAHN:  It was not a fatality.

8              THE COURT:  It was not a fatality?

9              MS. JAHN:  Significant injury to the --

10             THE COURT:  Significant injury.  All right.

11             I'm looking at the sentence -- the second

12    sentence from the bottom, which says, "Since the

13    collision, the defendant has experienced significant

14    stress and anxiety while traveling to work," which are

15    things that I think relate to his mental health.  And

16    I'm wondering whether you're still taking the position

17    that, under these circumstances, having a PSR, which I

18    accepted and the defendant did not object to, indicating

19    that this defendant last year was involved in a

20    significant accident that has caused him significant

21    stress and anxiety prior to this event in which he shows

22    up at a restaurant five hours away from his home

23    carrying an assault rifle, is it the defendant's

24    position that no mental health evaluation is warranted

25    by the record in this case?

1          MS. JAHN:  Yes, Your Honor.  With regard to

2    paragraph 75, I was present for the interview.  I know

3    Mr. Welch.  He doesn't use the word "anxiety."

4          Is that the proper characterization by

5    Ms. McGill, the pre-sentence report writer?  Sure.  He

6    used words to reflect how he felt after that accident.

7          Of course, another human being driving a car

8    striking another human being, it causes, as is

9    characterized, some anxiety here.

10          But there's nothing -- it's just outlining

11    what happened on this particular event in early -- I

12    think it was October of 2016.  There's no -- there's

13    nothing else in this entire presentence report nor put

14    forth by the defense about any mental health issues.

15          So on that basis, Your Honor, we object to the

16    language in which you've articulated as a condition of

17    supervised release.

18          THE COURT:  All right.  Let me hear from

19    Mr. Ahn.

20          MR. AHN:  Thank you, Your Honor.

21          For all the reasons that the Court has stated,

22    we believe that a mental health assessment is entirely

23    appropriate in this case.

24          In addition to the points that the Court has

25    already addressed, I would point out that people who

1    experienced the same event as the defendant, and that is

2    the armed invasion of Comet Ping Pong, were traumatized.

3    It's another reason to question whether or not the

4    defendant himself, not only going through the event, not

5    only knowing that he's inflicted trauma and harm,

6    psychological harm, deep scars on other people but also

7    realizing the gravity of his own conduct and how there

8    was nothing there.

9          Those facts, in addition to the fact that the

10   defendant described feelings of anxiety in connection

11   with a previous trauma that he saw somebody else that he

12   accidentally in that case imposed on other people, we do

13   think there's reason for an assessment.

14         With respect to the other conditions, because

15   they are contingent on having an assessment that

16   results -- and maybe the Court's conditions could be

17   more clear that, if a mental health assessment results

18   in a conclusion that the defendant has a medical or

19   particular diagnosis requiring anti-psychotic or other

20   psychiatric medications, if it is determined in the

21   mental health assessment that that's necessary, the

22   requirement of taking medication prescribed is entirely

23   reasonable and, I think, supported by a mental health

24   assessment suggesting that he has a condition.

25         THE COURT:  So let me just, before you walk

1   away, clarify that the government's position with

2   respect to the additional statement that you made

3   regarding the mental health consequences of this event

4   on the people -- the victims who were involved, I think

5   I understood you to say that, as a additional point in

6   the record, supporting the need for a mental health

7   assessment of the defendant is the fact that other

8   people who lived through this series of events had had

9   mental health effects.

10           MR. AHN:  Correct, Your Honor.  The same exact

11   experiences that other people -- that other people have

12   had and have described in more detail than has the

13   defendant caused them to require counseling and therapy.

14           The defendant is a human being, as has been

15   pointed out.  We all are.  And he experienced -- from a

16   different perspective, but he went through the same

17   events.

18           He was the driver and not the child who was

19   struck.  He was the gunman and not the people who were

20   terrified by his actions.  But he did experience the

21   same events, and that is an additional reason to say a

22   mental health assessment is a good idea.

23           THE COURT:  All right.  Ms. Jahn, I don't know

24   if you have a response or if you'd just like the Court

25   to rule on your objection.

1          MS. JAHN:  Your Honor, in general, a mental

2     health assessment in theory is fine.  But we all know

3     differing professionals in the mental health realm have

4     differing opinions.

5          And perhaps, if there is a professional in

6     North Carolina where he's being supervised that takes a

7     particular position about what he or she believes

8     Mr. Welch may or may not be suffering from and whether

9     or not that diagnosis then warrants medication, you can

10    imagine there will be litigation about that.  We can't

11    force-medicate people because --

12          THE COURT:  I'm happy to reevaluate the

13    medication condition.  What I'm really concerned about

14    is the Court's requirement under the law to consider

15    rehabilitation, to think about -- and the supervised

16    release conditions are the realm in which the Court is

17    required to do that.

18          And when we have situations such as this, it

19    seems to me odd that the defendant would object to an

20    assessment so that we can get to the bottom of whether

21    or not there are mental health concerns here that may be

22    needing treatment so that the defendant doesn't find

23    himself in this same position again.

24          MS. JAHN:  So an assessment -- in those

25    general terms, as we've just said, sure.  I don't think

1   Mr. Welch would have any objection to that in four

2   years' time to meet someone and determine whether or not

3   he has any mental health needs.

4          But what I'm concerned about is the language

5   that followed.  And I just -- while I get that there is

6   a concern here, what I need to focus on is what is in

7   the record and just --

8          THE COURT:  Well, I believe -- let me say,

9   your objection to the general overall conditions related

10  to mental health treatment is overruled.  I believe that

11  there is sufficient evidence in the record based on both

12  what the government has pointed out and what the Court

13  has pointed out to indicate that there is a potential

14  for some mental health needs in regard to the defendant

15  in this case.

16         So the Court will not remove the entire set of

17  conditions with regard to mental health assessment.

18         I will clarify that, to the extent that -- the

19  language was "You shall submit to a mental health

20  assessment and" -- and I said -- "if necessary."

21         So let me say if it is determined that mental

22  health treatment is required due to a diagnosed

23  condition of the defendant and that matter about a

24  diagnosis is reported to the Court in the context of

25  supervised release, then Mr. Welch will participate in a

1     mental health treatment program.

2           MS. JAHN:  So Your Honor now is imposing that,

3     if some physician determines that they believe he

4     suffers from some mental health diagnosis, that

5     information will then be relayed to the Court?

6           THE COURT:  During the period of supervision,

7     as you well know, Ms. Jahn, the Court is supervising --

8           MS. JAHN:  Yes, Your Honor.

9           THE COURT:  -- the defendant's period of

10    release.  Anything the defendant does, whether it be in

11    violation or otherwise, is reported to the Court or

12    reportable through the probation office.

13          MS. JAHN:  Yes, Your Honor.  I'm just trying

14    to track your language to understand what exactly you're

15    saying because it's hard to do this in this setting.  So

16    I'm just trying to be clear, what exactly you are

17    indicating so my objection, if need be, is noted for the

18    record.  As the Court knows, the D.C. Circuit requires

19    me to make objections now.

20          THE COURT:  Yes.

21          MS. JAHN:  So I'm just trying to get clarity

22    about what you're trying to do.

23          THE COURT:  I understand your point, and your

24    point is well taken.  I am trying to understand the

25    nature of your objection.

1          What I would like to happen -- and we can work

2     on the language together -- is that Mr. Welch, when he's

3     released for supervised release, be evaluated.  Let's

4     determine whether or not some additional mental health

5     treatment is required.

6          MS. JAHN:  No objection to the evaluation,

7     period.

8          THE COURT:  All right.  So would you like it

9     to stop there?

10          MS. JAHN:  Yes.

11          THE COURT:  All right.  I would like to add

12     that, to the extent the evaluation indicates that some

13     additional mental health treatment may be warranted, the

14     probation office will report that to the Court.

15          Are you okay with that?

16          MS. JAHN:  Yes.

17          THE COURT:  And the Court will make a

18     determination as to whether or not treatment should be

19     ordered in light of the information that is presented.

20          MS. JAHN:  Yes.  Because surely the Court will

21     ask for the defense position at that time, correct?

22          THE COURT:  Absolutely.

23          MS. JAHN:  Yes.  That seems agreeable,

24     Your Honor.

25          THE COURT:  All right.  So we will amend the

1   record to reflect what we have just talked about in

2   terms of the mental health assessment --

3              MS. JAHN:  Thank you.

4              THE COURT:  -- criteria.

5              Is there any other objection --

6              MS. JAHN:  No.

7              THE COURT:  -- that either party has to the

8   judgment of the Court?

9              MR. AHN:  No, Your Honor.

10             THE COURT:  All right.  So this concludes the

11  Court's judgment in this case.

12             Let me ask the government -- as set forth in

13  the plea agreement, the government has pledged to move

14  to dismiss the remaining count in the indictment.

15             Does the government wish to do so now?

16             MR. AHN:  We so move, yes.

17             THE COURT:  All right.  The government's

18  motion is granted.  Count III will be dismissed.

19             Ms. Jahn?

20             MS. JAHN:  Your Honor, I neglected earlier to

21  ask that the Court recommend that Mr. Welch be detained

22  at a facility closest to his home, in the alternative,

23  the location of Butner, North Carolina.

24             THE COURT:  All right.  I will make that

25  recommendation.  As you know, there are -- the Court is

1    not in control of where Mr. Welch is placed, but I

2    certainly can and will recommend that he be placed in a

3    facility close to his home, the closest facility or

4    Butner, if that is not possible.

5              MS. JAHN:  Thank you.

6              THE COURT:  Anything else?

7              MR. AHN:  No, Your Honor.

8              THE COURT:  All right.  Mr. Welch, good luck.

9              PROBATION OFFICER:  Your Honor --

10             THE COURT:  Sorry.  We're going to keep going

11   for one second, Mr. Welch.  One more thing.

12             PROBATION OFFICER:  As the Court is aware,

13   Mr. Welch lives in North Carolina, which is supervised

14   by the Middle District of North Carolina.

15             So the probation office would request that the

16   Court authorize the presentence report and sentencing

17   judgment and commitment order and related charging

18   documents be released to the Middle District of North

19   Carolina for purposes of supervision.

20             And then we would just ask that the Court

21   entertain whether or not it will transfer jurisdiction

22   to that Court as well or if we would just transfer

23   supervision to that Court.

24             THE COURT:  Transfer jurisdiction right now

25   over the whole thing or the period of supervision?

1        PROBATION OFFICER:  If the Court could

2    determine now whether or not it's interested in doing it

3    now.  And we can certainly revisit that at the time.

4        THE COURT:  All right.  Let me hear if there

5    are objections from the parties to either of those

6    requests.

7        MR. AHN:  No objection from the government as

8    to supervision.

9        And with respect to jurisdiction, we believe

10   it's appropriate that the Court -- this Court retain

11   jurisdiction at least relatively through the end of the

12   period of supervised release.

13       THE COURT:  Let me just be clear, Ms. McGill.

14   Were you suggesting that this Court relinquish

15   jurisdiction to another Court in North Carolina, or are

16   you just talking about the probation office

17   responsibilities?

18       PROBATION OFFICER:  Supervision we

19   automatically transfer to the district where the

20   individual lives for courtesy supervision.  So the Court

21   does not need to authorize that.

22       However, if the Court is interested in

23   transferring jurisdiction of the case, that is something

24   that has to be ordered by the Court, and there's a

25   document that is required by the probation office in

1    order for the Court --

2            THE COURT:  I see.  That's the second point.

3    I'm actually not interested in transferring

4    jurisdiction.

5            But let me hear from Ms. Jahn.

6            MS. JAHN:  I was just going to recommend -- I

7    know the Court's normal practice sometimes is to have a

8    progress hearing.

9            THE COURT:  Yes.

10            MS. JAHN:  Perhaps once incarceration is

11    completed, we could receive some information about how

12    things are going.  And it may be appropriate six months

13    or a year down the line to transfer supervision, but I

14    think at this time it's just too premature to make a

15    representation about that.

16            THE COURT:  I agree.  I will release the

17    documents to North Carolina to facilitate the courtesy

18    supervision, but I will retain jurisdiction in the case.

19    And once he's released, everyone will come back and

20    we'll figure out what supervision looks like.

21            All right.  Anything else?  Thank you.

22                    (Proceedings adjourned at 1:14 p.m.)

23                    *******************

24

25

1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3     I, Barbara DeVico, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9

10

11    _____          7-24-17

12    SIGNATURE OF COURT REPORTER              DATE

13

14

15

16

17

18

19

20

21

22

23

24

25